[No. A050793. First Dist., Div. Three. Nov. 20, 1991.]

MARIN MUNICIPAL WATER DISTRICT, Plaintiff and Appellant, v. KG LAND CALIFORNIA CORPORATION et al., Defendants and Respondents.

1654

1656

**COUNSEL**

Orrick, Herrington & Sutcliffe, George A. Yuhas and Mary J. Novak for Plaintiff and Appellant.

Grueneich, Ellison & Schneider, Dian M. Grueneich and Anne J. Schneider as Amici Curiae on behalf of Plaintiff and Appellant.

Collette & Erickson, John M. Collette, Robert A. Schwartz, Kenneth J. Cohen, Kindel & Anderson, Bruce J. Russell and Joshua R. Steinhauer for Defendants and Respondents.

---

**OPINION**

STRANKMAN, J.*—The Marin Municipal Water District (the District) declared a water shortage emergency in its service area in 1989 and imposed a moratorium on new service connections, pending the development of new water supplies. Before imposing the moratorium, the District issued an environmental impact report (EIR) concluding that the proposed restriction would have no significant adverse environmental effects. Developers KG Land California Corporation (KG Land), Perini Land and Development Company (Perini) and others who opposed the moratorium challenged the EIR in the trial court, claiming among other arguments that it failed to analyze adequately the adverse environmental consequences of the moratorium or to consider several purportedly feasible alternatives. The trial court concluded that the report was invalid under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] The District has appealed; we reverse the judgment.

---

*Presiding Justice of the Court of Appeal, First District, Division One, sitting under assignment by the Chairperson of the Judicial Council.

[1]Unless otherwise indicated, all further statutory references are to the Public Resources Code.

### FACTUAL AND PROCEDURAL BACKGROUND

The District is a public utility which provides water to approximately 167,000 people in a 147-square-mile area of Marin County. The District's service area extends north along the east side of the county from the Golden Gate Bridge to and including part of Novato. Its primary water source is rainfall and runoff stored in seven reservoirs or lakes.

The District determined in late 1984 that it could prudently supply 35,000 acre-feet of water annually to its consumers.[2] Thereafter, studies indicated that its growth projections were too low; in addition, per capita water consumption increased more than anticipated. In September 1988, the District began preparation of a new Water Supply Master Plan to update growth projections and address alternative sources of water supply.

The demand for new connections also increased faster than anticipated. As of February 1989, only about 495 acre-feet remained uncommitted, and the District declared a water shortage emergency pursuant to Water Code sections 350 et seq. and 71640 et seq. It adopted an urgency ordinance temporarily prohibiting any new water service connections, to become effective upon its allocation of 34,900 acre-feet of water, and subject to certain limited exceptions. At the same time, the District continued work on the new Water Supply Master Plan.

As of April 1989, only about 18 acre-feet remained uncommitted, and the District proposed a new ordinance prohibiting new water service connections for an extended indefinite period. A draft environmental impact report (DEIR) was prepared to evaluate the potential environmental effects of this moratorium and consider alternatives to its adoption.

Initially, the DEIR explained that despite the District's doubts whether the moratorium was a project within the meaning of CEQA, it had chosen to proceed with the EIR process and would consider the EIR before any decision on adoption of the moratorium. The DEIR concluded that the moratorium would have a beneficial effect on water supply by restricting additional demand in the District until new water supplies could be developed and would have no adverse environmental impact either on water supply or existing consumers. It then commented on the potential effect of the moratorium on economic conditions within the District's service area,

---

[2]This amount, termed the District's operational yield, was based in part on an analysis of conditions from 1928 through 1986, including the 1976-1977 drought; it allows for consecutive deficiencies of 15 percent and 33 percent upon a recurrence of drought conditions similar to those of 1976-1977 and total depletion of reservoir storage.

not because those conditions would result in significant environmental effects, but "for informational purposes." As will be discussed in more detail later, the DEIR analyzed the possible impact of the moratorium on housing stock, housing affordability, employment, and public finance. It concluded, "[W]hile certain potentially adverse economic effects were identified, they were determined not to have an adverse effect on the physical environment."

The DEIR also discussed two alternatives to the moratorium: no project and mandatory conservation of 15 percent. As will be discussed, it rejected both and concluded that the moratorium would be environmentally superior and would have the least effect on the District's existing customers.

The District received numerous comments on the DEIR and held a public hearing; those comments and the District's written responses were incorporated into the final EIR. At its December 13, 1989, public meeting, the District certified the adequacy of the EIR and adopted the moratorium.

Perini, KG Land, and Joe and Haidy Shekou (the Shekous) filed petitions for writs of mandate and complaints for declaratory relief challenging the District's compliance with CEQA in certifying the EIR and adopting the moratorium; their actions were consolidated. After a hearing, the trial court concluded that the EIR was deficient in several respects, both substantive and procedural. Among the court's conclusions were that the EIR did not consider and analyze adequately the potentially significant adverse secondary environmental effects of the moratorium, an appropriate range of feasible alternatives to its adoption, and its inconsistencies with potentially affected local and regional plans. The court also concluded that the final EIR included significant new information requiring its recirculation before certification.

The court then ordered the District to void its certification of the EIR and either repeal the moratorium or prepare a new EIR; it also granted a limited injunction regarding enforcement of the moratorium. In effect the injunction required the District to provide up to 200 acre-feet of water (1) to those on the District's waiting list for new connections as of July 30, 1990, including Perini, and (2) to KG Land and the Shekous, who were apparently not then on the waiting list, provided that they otherwise complied with the District's generally applicable water service procedures.

The District appeals from the judgment. Respondents are KG Land and Perini; the District has settled its dispute with the Shekous, who are no longer parties to this appeal. We have issued a writ of supersedeas staying

that portion of the order enjoining enforcement of the moratorium, pending our determination of the appeal.

## DISCUSSION

### A. *Introduction*

■ The Supreme Court has repeatedly observed that the Legislature intended CEQA to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statutory language. (See, e.g., *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278]; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) The EIR has been described both as the heart of CEQA and as an environmental alarm bell, whose purpose is to inform the public and its responsible officials of the environmental consequences of their decisions before those decisions are made. (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161]; *County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377.)

Nevertheless, that court has also cautioned, "The wisdom of approving . . . any . . . project, a delicate task which requires a balancing of interests, is necessarily left to the sound discretion of the local officials and their constituents who are responsible for such decisions." (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 576.) Therefore, a court's inquiry into agency actions under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) The reviewing court assesses only the sufficiency of an EIR as an informative document, not the correctness of its environmental conclusions; it may not set aside an agency's approval of an EIR on the ground that a different conclusion would have been equally or more reasonable. (*Citizens of Goleta Valley, supra,* at p. 564.) When applying the substantial evidence standard to the agency's determination, the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at pp. 392-393, and fn. 5.)

### B. *Secondary Consequences of the Proposed Moratorium*

■ The trial court concluded that the EIR did not consider and evaluate adequately the possible secondary adverse environmental consequences of

the moratorium, particularly those resulting from its effect on (1) the ability of cities in the District to meet their regional fair share of housing; (2) any regional jobs/housing imbalance; (3) regional growth and the development of vacant land in neighboring communities; and (4) the generation of fees for public services and on environmental services funded by these fees. The District contends that its analysis was sufficient, and we agree.

■■ ■ ■ With certain limited exceptions, CEQA requires an EIR whenever a public agency proposes to approve or carry out a project that may have a significant effect on the environment. (§§ 21100, 21151; Guidelines, § 15002, subd. (f)(1).)[3] " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068; see also Guidelines, § 15002, subd. (g) ["significant effect on the environment is defined as a substantial adverse change in the physical conditions which exist in the area affected by the proposed project. . . ."].)[4]

■ According to the Guidelines, both primary and secondary environmental consequences must be considered in determining whether a project may have a significant effect. Primary or direct consequences are those immediately related to the project, i.e., dust and noise resulting from construction of a sewage treatment plant; secondary or indirect consequences "may be several steps removed from the project in a chain of cause and effect," i.e., increased air pollution which may result from population growth facilitated by construction of that plant. (Guidelines, § 15064, subd. (d)(1), (2).)

■ Generally social and economic changes resulting from a project are not treated as significant environmental effects, either primary or secondary, which require EIR analysis. (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1516 [258 Cal.Rptr. 267]; *No Slo Transit, Inc. v. City of Long Beach* (1987) 197 Cal.App.3d 241, 256 [242 Cal.Rptr. 760]; Guidelines, §§ 15064, subd. (f),

[3]References to Guidelines are to the state CEQA Guidelines, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) Although the Supreme Court has not decided whether the Guidelines are regulatory mandates or simply interpretive aids, it has stated that at a minimum, courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at p. 391, fn. 2.)

[4]The question which immediately springs to mind is how a moratorium of this type, which by its very nature will maintain the status quo rather than foster development, might result in *any* adverse change in physical conditions existing in the area, let alone one which is substantial. Nevertheless, the District chose to participate in the EIR process and did not argue in the trial court that CEQA compliance was not required; thus that issue is not before us.

15131.) Nevertheless, the Guidelines do explain that a project's social and economic effects may have some relevance in determining the significance of a physical change; for example, an EIR may identify anticipated economic changes which will in turn cause a physical change, or may use economic effects to determine the importance of physical changes. (Guidelines, §§ 15064, subd. (f), 15131, subds. (a), (b).)[5] But "[t]he focus of the analysis shall be on the physical changes." (Guidelines, § 15131, subd. (a).)

■ Analyzing whether a project may have a significant environmental effect necessarily involves some degree of forecasting, but perfect prescience is not required. For example, EIR analysis may be required if the future expansion and general type of future use of a project are reasonably foreseeable and likely to change the scope or nature of the project and its environmental effects. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at p. 396.) But when the nature of future development is nonspecific and uncertain, an EIR need not engage in "sheer speculation" as to future environmental consequences. (*Atherton* v. *Board of Supervisors* (1983) 146 Cal.App.3d 346, 351 [194 Cal.Rptr. 203]; see also *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 286 [152 Cal.Rptr. 585] [" 'Crystal ball' inquiry is not required."].) Section 15145 of the Guidelines expresses a similar consideration: "If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact."

■ Here, it is undisputed that the moratorium presented no risk of primary or direct adverse environmental consequences. As suggested by the Guidelines, the EIR did consider and discuss potential social and economic effects of the moratorium which could result in secondary environmental consequences. Its analysis of housing is illustrative of its approach to these nonenvironmental factors. First, the EIR explained that the moratorium would not affect residential construction for at least five or six years, because numerous pending development projects have already received water commitments and remain to be built during that time. The EIR then acknowledged that a moratorium of longer than five or six years could result in increased pressure for growth and development in areas outside the

---

[5]Section 15064, subdivision (f), of the Guidelines provides in pertinent part: "Economic and social changes resulting from a project shall not be treated as significant effects on the environment. Economic or social changes may be used, however, to determine that a physical change shall be regarded as a significant effect on the environment. Where a physical change is caused by economic or social effects of a project, the physical change may be regarded as a significant effect in the same manner as any other physical change resulting from the project. Alternatively, economic and social effects of a physical change may be used to determine that the physical change is a significant effect on the environment. . . ."

District's service area. But future development in communities outside the District's service area and in other counties will be dependent on what those local agencies permit, among many other factors, and the environmental consequences of any such development will necessarily be considered and analyzed in subsequent environmental impact reports. Accordingly, the District reasonably concluded that the potential environmental impact of possible future development elsewhere was simply too speculative to evaluate; it was therefore unable to identify any secondary adverse environmental consequences which might result from the effect of the moratorium on housing.

The EIR provided a similar analysis of employment. It acknowledged that Marin County traditionally has had a larger labor force than number of jobs and discussed the moratorium's possible impact on this "jobs/housing imbalance." Again, however, the EIR emphasized the problems involved in forecasting the long-range effect of the moratorium. It recognized that if the moratorium lasted for an extended period, the reduction of new commercial development could result in slowing employment growth. But to illustrate the difficulty in predicting the physical or environmental changes which might result from changes in employment patterns, it suggested two possible scenarios. A reduction in commercial development in the District's service area might mean that more of its residents will commute elsewhere, thereby causing increased highway congestion; conversely, it might also mean that fewer people will commute from elsewhere into the area, thereby reducing potential highway congestion.

The EIR also considered the impact the moratorium might have on public finance. It acknowledged that the moratorium would lessen local government revenue generated by development fees but concluded that any decrease in fees would be offset by the reduced demand for public services which would result from reduced development.

To summarize, the EIR addressed the possible economic and social impact of the moratorium and concluded that any such impact would not be felt for several years; obviously, then, there would be no secondary environmental consequences at least for that period. The EIR then reasonably refused to speculate about possible secondary environmental consequences which might result from any long-term economic or social changes. Given the unique nature of the project under consideration, this analysis was legally adequate. Respondents' disagreement with the EIR's conclusions does not establish that the analysis which led to those conclusions was deficient.

## C. *Feasible Alternatives to the Moratorium*

We next consider whether the EIR included and adequately analyzed an appropriate range of feasible alternatives to the moratorium. The trial court concluded that it did not; again, we disagree.

It is state policy that governmental agencies at every level must "consider alternatives to proposed actions affecting the environment." (§ 21001, subd. (g).) To further that public policy, an EIR must identify both the significant effects of a project on the environment and alternatives to the project. (§ 21002.1, subd. (a); see § 21061.) A feasible alternative is one which is "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (See § 21061.1; Guidelines, § 15364.)

The Supreme Court has recently instructed, "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. . . . [A]n EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project . . . which: (1) offer substantial *environmental* advantages over the project proposal . . . ; and (2) may be 'feasibly accomplished in a successful manner' considering the economic, environmental, social and technological factors involved. [Citations.]" (*Citizens of Goleta Valley* v. *Board of Supervisors, supra*, 52 Cal.3d at p. 566, italics added.) An exhaustive list of alternatives is not required, and the statutory requirements for consideration of alternatives must be evaluated against a rule of reason. (*Id.,* at p. 565.)

Consistent with these statutory and judicial principles, the Guidelines state that an EIR must "[d]escribe a range of reasonable alternatives to the project . . . which could feasibly attain the basic objectives of the project and evaluate the comparative merits of the alternatives." (Guidelines, § 15126, subd. (d).)

If the agency finds certain alternatives to be infeasible, its analysis must explain in meaningful detail the reasons and facts supporting that conclusion. The analysis must be sufficiently specific to permit informed decision-making and public participation, but the requirement should not be construed unreasonably to defeat projects easily. An EIR need not consider in detail every conceivable variation of the alternatives stated; instead, as with the range of alternatives which need discussion, the level of analysis is subject

to a rule of reason. (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at pp. 406-407.)

The DEIR under consideration here discussed two possible alternatives: no project and a form of mandatory conservation. The no project alternative would obviously mean continued commitment of water service to new users without restriction. The DEIR explained that with no moratorium, the risk of water shortage would become unacceptable sometime in the early 1990's. The mandatory conservation alternative would attempt to reduce the amount of water needed to satisfy existing commitments by mandating an immediate 15 percent cut in water use by all existing customers; to maintain demand below the safe yield of the system, that reduction would necessarily have to be increased as the number of new connections grew.

The DEIR concluded that the moratorium was the environmentally superior alternative. It acknowledged that none of the three alternatives would have a direct effect on the natural environment, but cautioned that extended rationing could result in some loss of landscape vegetation. It pointed out that development increases the rate of air and water pollution and converts lands with value as wildlife habitat to urban or suburban uses; it concluded that the moratorium would have an indirect beneficial effect on the natural environment by slowing and ultimately halting land development if additional water supplies are not developed. The DEIR also acknowledged that mandatory conservation would reduce the risk of shortage, but only by accepting immediate and increasingly stringent routine reductions in use.

Comments to the DEIR suggested other possible alternatives, including a tiered rate system (i.e., higher rates for water use in excess of certain amount), increased development and use of reclaimed water, expedited development of new water sources, such as the Russian River or additional water from Phoenix Lake, 5 or 10 percent mandatory conservation, voluntary conservation, and use of water allocated to Hamilton Field, for which there are no current development plans.

The final EIR rejected each of these alternatives. Although plans were underway to upgrade the quality and quantity of reclaimed water, its current quantity and permissible uses were limited. New water sources could not be implemented immediately; any benefits from such development would not be felt for at least five years or more. The possibility of extracting additional water from Phoenix Lake had already been rejected, after assessing the cost of development, as well as aesthetic and recreational considerations. Reduc-

ing the District's existing commitments by rescinding its 750 acre-feet commitment to Hamilton Air Force Base was also not considered to be a feasible alternative; the EIR explained that although one development proposal for that site had been rejected by the voters, uncertainty about whether the District could legally extinguish its commitment to serve the base meant that such action could not be deemed a feasible alternative. The remaining alternatives suggested in comments were variations on the conservation alternative considered and rejected in the DEIR, and were rejected in the final EIR for similar reasons.

Respondents disagree with the District's conclusion that the moratorium is the environmentally superior alternative, but our task is only to assess the sufficiency of the EIR as an informative document, not the correctness of its environmental conclusions. What must be emphasized in reviewing these alternatives is that the objective of the moratorium was not to solve the District's long-term water supply problems; rather, its more modest goal was to prevent an immediate over-commitment of the District's water supply, as the District's operational yield was effectively fully committed when the EIR process began. The EIR explained why each suggested alternative either could not satisfy this goal, did not offer substantial environmental advantages over the moratorium, or could not be feasibly accomplished in a successful manner considering the economic or environmental or technological factors involved. (See *Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 566.) The EIR discussed a reasonable range of alternatives and provided an adequate discussion of their feasibility; no more was required.

D. *Recirculation of the DEIR*

As we have stated, the essential purpose of the EIR is to inform the public and its responsible officials of the environmental consequences of their decisions before they are made. (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 564.) Therefore after a DEIR has been completed, it must be made available to interested parties and the public for their comments. (Guidelines, § 15087.) The responsible agency must evaluate these comments and prepare a written response which describes the disposition of significant environmental issues raised; the response to comments may take the form of a revision to the DEIR or may be a separate section in the final EIR. (Guidelines, § 15088.) The agency must prepare and certify a final EIR before approving the project. (Guidelines, §§ 15089, 15090.) When "significant new information" is added after public notice and

public agency consultation and comment, but before certification, the lead agency must issue a new notice and recirculate the EIR. (§ 21092.1.)[6]

Recirculation is not required if a revision simply clarifies, amplifies, or makes insignificant modifications to an adequate EIR. On the other hand, when substantial new information on the environmental consequences of a project is added to an inadequate EIR, recirculation is essential. *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813 [176 Cal.Rptr. 342] is illustrative. In that case, the county board of supervisors circulated a DEIR about a proposed tomato paste processing plant. After a public hearing at which the document was criticized for several deficiencies, the Board determined that the document should be redrafted. A revised final EIR was prepared, which fundamentally reorganized the previous material and provided a considerable amount of new information, including many additional details about the potential effect of the plant on the environment; it also substituted some new data for information which had been repudiated by its purported author. Under these circumstances, the reviewing court concluded that the failure to recirculate the revised final EIR to responsible public agencies rendered it procedurally inadequate. (*Id.*, at pp. 822-823.)

In the present case, the trial court concluded that the final EIR included significant new information, "such as reference to information in the Water Supply Master Plan prepared for the District," that required its recirculation under section 21092.1. Respondents expand upon or explain that conclusion, urging that not until the release of the Water Supply Master Plan, which was completed and made available to the public after preparation of the DEIR, was it clear that the moratorium would have a probable duration of 10 years or more.

Respondents' argument is not convincing. The DEIR stated that the District proposed to adopt a moratorium for an "extended, although indefinite period," until additional water supplies were developed and in place. The discussion of the potential impact of the moratorium included consideration of what might result if it lasted for more than five or six years. The final EIR here did not contain substantial new information about the duration of the moratorium or its environmental consequences; instead, it reiterated that the duration was uncertain and was dependent on the development of new water supplies.

---

[6]Section 21092.1 provides in pertinent part, "When significant new information is added to an [EIR] after notice has been given pursuant to Section 21092 and consultation has occurred pursuant to Sections 21104 and 21153, but prior to certification, the public agency shall give notice again . . . and consult again . . . before certifying the [EIR]."

*City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438 [263 Cal.Rptr. 340], upon which respondents rely, is inapposite. The proposed project in *Santee* included an "interim men's detention facility" which would serve until new detention facilities relieved an existing jail overcrowding problem. (*Id.*, at pp. 1450-1451.) Neither the draft nor the final EIR specified the duration of this interim period, but the traffic impact analysis attached to the final EIR was based on three years. When the agency certified the final EIR, it also set a seven-year limit for removal of the interim project. The reviewing court concluded that the board's belated setting of a seven-year time frame was "too little too late" to apprise all interested parties of the scope of the project and that the EIR was therefore inadequate. (*Id.*, at p. 1454.) Here, in contrast, the project was consistently defined as a moratorium of indefinite duration; the final EIR contained no significant new information.

Our conclusion is dispositive of respondents' related contention that the District did not comply with the notice and consultation requirements of section 21092.2 before certifying the final EIR; that section mandates further notice and consultation only when significant new information is added.

E. *Consistency With General Plan*

 A local agency engaged in EIR analysis may not ignore regional needs and the cumulative impacts of a proposed project. (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 573.) Thus the Guidelines require an EIR to discuss any inconsistencies between the proposed project and applicable general and regional plans. (Guidelines, § 15125, subd. (b).) Respondents contend that the EIR did not adequately consider inconsistencies between the moratorium and the housing elements of local and regional general plans.

Again, the argument reflects respondents' disagreement with the conclusions of the EIR but does not establish its inadequacy as an informative document. Housing needs identified in a general plan are simply goals, not mandated acts. (*Northwood Homes, Inc.* v. *Town of Moraga* (1989) 216 Cal.App.3d 1197, 1204 [265 Cal.Rptr. 363].) The final EIR did address the relationship between the moratorium and local general plans. Responding to comments, it stated in pertinent part that the "proposed ordinance would generally be consistent with the intent of local general plans to guide community growth and ensure the adequate provision of water and other community services in a coordinated and efficient manner." In other words, whatever their stated housing goals, general and regional plans favor devel-

opment only where there is adequate water and other utilities. Respondents cite no authority to the contrary.

## F. *The Injunction*

The District contends even if the EIR requires revision, the trial court's remedy here was inappropriate, in part because it ignored the District's determination that the maximum amount of water which can be safely committed annually to customers has already been reached, and favored respondents over other potential users. Because we have concluded that the EIR was legally sufficient, we need not address this issue.

### DISPOSITION

The judgment is reversed and the trial court is directed to enter judgment denying respondents' petitions for writ of mandate and complaints for declaratory relief. Costs to appellant.

Merrill, Acting P. J., and Chin, J., concurred.