Opinion
 

 JOHNSON, Acting P.J.
 

 In this appeal we consider the new market-based program for reducing certain pollutants and a challenge claiming the rules establishing the program are invalid because the underlying studies failed to project the program’s socioeconomic and environmental impacts for the year 2000 and beyond. We find the law requires estimates of socioeconomic
 
 *57
 
 effects only to the extent data are available and does not require estimates of environmental impacts which are speculative. Accordingly, we affirm the trial court’s summary judgment denying the challengers’ writ petition.
 

 Facts and Proceedings Below
 

 According to the federal government the greater Los Angeles basin has the most polluted air in the entire nation, indeed the only area rated as experiencing “extreme air pollution.” Since 1970 federal, state, and local governments have been attempting to address this problem through regulations and other measures designed to reduce emissions of substances which pollute the air we breathe. The federal Environmental Protection Agency (EPA) sets overall national standards of air quality and the state Air Resources Board (ARB) sets more stringent California standards, both of which the local South Coast Air Quality Management District (SCAQMD) is charged with attaining. The SCAQMD’s plans for doing so must pass muster with both the EPA and the ARB. If they fail, then either or both of these agencies is empowered to impose its own plan on this region. (42 U.S.C. 7410(c)(1); Health & Saf. Code, § 41503.2, subd. (c);
 
 Coalition for Clean Air
 
 v.
 
 Southern Cal. Edison
 
 (9th Cir. 1992) 971 F.2d 219, cert. den. (1993) 507 U.S. 950 [113 S.Ct. 1361, 122 L.Ed.2d 740].)
 

 Until 1991, the SCAQMD used a “command and control” system as its primary strategy for dealing with refineries, factories, and similar stationary sources of pollution. This strategy commands specific polluters to reduce emissions of defined substances to specified levels by installing specific control systems on the individual pieces of equipment and processes which generate the polluting substances. Thus, the agency might command a power plant to reduce the amount of one pollutant emitted from its smoke stack to x parts per million by installing a converter or other device designed to meet that standard. Simultaneously, it might require the same power plant to reduce the amount of another pollutant by installing other pollution control equipment on a couple of small machines in its workshop.
 

 Beginning in 1994, however, after years of study, the agency embarked on a new basic strategy of pollution control by establishing the Regional Clean Air Incentives Market (RECLAIM). The purpose is to encourage pollution sources to adopt the most cost-effective and innovative pollution control measures. RECLAIM seeks to accomplish this by creating a market in pollution “rights” (that is, rights to add a certain amount of pollutants to the basin’s atmosphere). Sources acquire these pollution “rights” by reducing their own emissions below the annual cap the SCAQMD establishes for that
 
 *58
 
 particular factory, refinery, or other firm at the beginning of the RECLAIM program. Thus, if a power plant installs a new sophisticated converter in its smokestack and thereby reduces its emissions to 25 percent below the maximum allowed under the SCAQMD cap, it can sell its “rights” to emit more pollutants than it currently does to another power plant or a refinery or some other pollution source which is exceeding its cap. Indeed if some source is far over its cap it may have to enter the market and buy pollution rights from several other sources in order to continue operating at current levels of production and pollution generation.
 
 [1]
 

 The SCAQMD can only make progress toward better air quality, however, by steadily diminishing the overall annual caps on allowable emissions for each site. Thus, our hypothetical power plant’s new pollution control equipment may reduce its emissions to a level 10 percent below the cap established in the first period of the plan’s implementation, but during the second period find itself only 3 percent below that period’s reduced cap and with a corresponding reduction in the pollution credits it can sell, and in the third period find itself producing emissions which exceed the latest cap by 5 percent. In that year, it would have to choose between installing a new generation of more sophisticated pollution control devices or reducing the scale of its operations to remain under the cap or going to the market where it formerly was selling pollution credits and buying them from other sources which were still under the third period’s reduced cap.
 

 The SCAQMD established its initial caps for RECLAIM using historical data from the “command and control” era about each pollution source. Because RECLAIM started in the midst of a recession, the agency allowed firms to choose their peak year of operations (and pollution generation) from
 
 *59
 
 1989-1992 as their cap. These caps are “mass emissions caps” for each factory or other site, however, rather than caps on every piece of individual equipment in that factory or site as required by the “command and control” system. As a result, the factory or other site can allocate its pollution reduction resources most cost effectively, perhaps reducing to near zero the pollution generated by one machine because that can be done cheaply while not putting any pollution control equipment at all on another where the costs of such equipment would be very expensive.
 

 The state required the RECLAIM program to reduce emissions by at least the same rate as the “command and control” system previously in place. (Health & Saf. Code, § 39616, subd. (c)(1).) The “command and control” system the EPA and ARB approved in 1991 envisioned a succession of new and improved pollution control technologies over future years and set its interim and final pollution reduction targets on that basis. This plan described these as tier I, tier II, and tier III technologies, with tier I consisting of existing equipment, and tiers II and III which anticipated significant improvements in existing technologies or completely new approaches.
 

 The initial RECLAIM period spans the time frame of the tier I and tier II technologies. In order to match the pollution reduction the “command and control” system would have achieved during that period, the RECLAIM program reduces the mass emissions cap for facilities emitting SOx by 6.8 percent annually and for those emitting NOx by 8.3 percent annually. These annual cap reductions extend through the full term of the current RECLAIM program, that is, to the year 2004.
 

 Before instituting the RECLAIM program, SCAQMD engaged in a three-year process of study and hearings. The full process is reflected in the 112-volume administrative record before this court. Among other things, the SCAQMD appointed a 13-member steering committee with representatives from government, business, and environmental organizations. It also formed a 50-member public advisory group and a dozen working groups. Among these was the Socioeconomic and Environmental Working Group which examined the economic and environmental impacts which are the subject of this appeal.
 

 In November 1992, nearly two years into the process, SCAQMD was in a position to circulate a preliminary draft of its RECLAIM rules. After comments and hearings, in February 1993 it circulated a second draft of those rules and held another round of hearings. In May 1993 the SCAQMD issued a draft socioeconomic report (SR) and a draft environmental assessment
 
 *60
 
 (EA). In July it circulated another set of draft rules and revisions to the SR and EA.
 

 The final stages of the process took place in the fall of 1993. The SCAQMD governing board held public hearings on September 9 and 10, 1993. Those hearings were continued to October. On October 15, appellants, the Alliance of Small Emitters/Metals Industry, Liston Aluminum Brick Company of Corona, Shultz Steel Company and TST, Inc., appeared for the first time to register their objections. Thereafter, the final plan was submitted and approved by the relevant state bodies and ultimately by the EPA, thus becoming a federally enforceable element of the “State Implementation Plan.” (61 Fed.Reg. 57775 (Nov. 8, 1996).)
 

 Among the provisions in the final RECLAIM plan are several requiring ongoing reviews and potential adjustments in the program’s rules. SCAQMD rule 2015(b)(2) requires an annual assessment of both socioeconomic and air quality impacts and rule 2015(b)(3) mandates a comprehensive three-year audit of RECLAIM to ensure it is not causing unanticipated adverse impacts. (See also Health & Saf. Code, § 40440.2.) The SCAQMD governing board has scheduled a public hearing on the first of these three-year audits for 1998. Among other issues, the SCAQMD must investigate and assess whether “control technology has advanced as much as projected under the AQMP.” (SCAQMD rule 2015 (b)(3)(D), (J).) Further, as to metal melting furnaces and certain other pollution sources, it must reevaluate the availability of future control technology and in doing so “take into account . . . environmental, energy, and economic impacts . . . .”
 

 On December 2, 1993, appellants filed a “shotgun” writ petition which they subsequently refined to a “rifle shot” appeal. The initial pleading alleged violations of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), of due process, of the contracts clause, of “one person-one vote,” of Health and Safety Code section 39620, and Health and Safety Code section 40440 et seq. The trial court severed the CEQA claim and after a hearing denied the petition based on that claim. At a subsequent hearing on respondent’s and appellants’ summary judgment motions regarding the remaining causes of action, the court granted respondent’s motion and denied appellants’ two motions. The court entered final judgment and appellants timely appealed, although on narrower grounds than they raised in the trial court.
 

 Discussion
 

 Appellants have abandoned many of their initial claims either during the trial proceedings or in the process of refining their arguments on appeal.
 
 *61
 
 Thus, only two issues are before this court: whether the SCAQMD adequately analyzed the economic effects and whether it properly analyzed the environmental effects of its RECLAIM air pollution control program.
 

 I.
 
 The Trial Court Properly Found the SCAQMD’s Economic Analysis Was Sufficient.
 

 Appellants (emitters) first argue the SCAQMD’s economic analysis required by applicable provisions of the Health and Safety Code (§§ 40728.5, 40440.8, 40703, 40440, 40440.5) did not sufficiently examine RECLAIM’S impact on the year 2000 and beyond.
 
 [2]
 
 Appellants further assert the trial court applied the wrong standard of review in considering their claims because the issue whether the SCAQMD adequately analyzed RECLAIM’S economic impact is a pure question of law. Therefore, appellants contend because the SCAQMD failed to analyze the economic impacts of RECLAIM for the post-2000 period, the trial court erred by applying the deferential standard of review.
 

 The SCAQMD responds it did in fact comply with applicable Health and Safety Code provisions which require it only to analyze the socioeconomic impacts to the extent data are available and to the extent it is feasible. The SCAQMD contends more detailed analysis of RECLAIM’S economic impact depends upon the outcome of the RECLAIM trading credit program. The SCAQMD designed a computer model to estimate the outcome of trades under RECLAIM.
 
 [3]
 
 The model examines the relationship between the cost of doing business and the cost of reducing emissions. In order for the model to be able to forecast how companies will act under RECLAIM, three factors are absolutely essential. The three factors include: 1) the types of control measures available to sources; 2) the cost of those control measures; and, 3) the quantity of emissions reductions the technology will yield.
 

 The SCAQMD claims its analysis of RECLAIM’S economic impact cannot be totally complete because technology does not exist to predict the trading outcome or the economic impacts of trading for the post-2000 years. Furthermore, because modeling cannot predict the trading outcome, the
 
 *62
 
 SCAQMD cannot know “the ultimate distribution of emissions among companies.”
 

 The SCAQMD concludes that due to the fact the tier II technology was not yet known when it performed its studies, the agency’s experts could not analyze the economic impacts after the year 1999 in the same detailed manner as they had for the 1994-1999 period when the primary technology in place would be existing tier I measures. Therefore, the SCAQMD assumed the costs associated with pollution reductions in the year 1999 would continue for the period 2000 and beyond. Accordingly, it analyzed these costs using its regional economic model (REMI) to determine RECLAIM’S economic impact for the post-2000 period.
 

 The SCAQMD’s final socioeconomic impact analysis (Analysis) supports its contention it properly analyzed the economic impact of RECLAIM for the 1994-1999 and post-2000 years, pursuant to the applicable Health and Safety Code provisions.
 

 The Analysis basically compares the economic impact under the RECLAIM rules and the “command and control” rules and measures (which the RECLAIM rules replaced). The Analysis gives a detailed description of the economic effects of RECLAIM from 1994-1999 and provides a limited discussion on RECLAIM’S impact on jobs for the years post 2000.
 

 In general, the Analysis states the RECLAIM rules offer a more efficient way of complying with air quality standards than the “command and control” rules. It then breaks down the cost of compliance (under both rules) by county and industry and concludes the RECLAIM rules will lower costs on average by $57.9 million annually over the 1994-1999 period, with Los Angeles County reaping 72 percent of the lower costs, followed by Orange County (17 percent), San Bernardino County (11 percent) and Riverside County (where there was no real cost difference between the two rules).
 

 Second, the Analysis compares the effect on jobs from 1994-1999 resulting from both the RECLAIM and “command and control” rules. Under RECLAIM, approximately 866 jobs will be lost on average per year, while 2,013 jobs on average would be lost per year under the “command and control” rules.
 

 Finally, the Analysis discusses RECLAIM’S impact on jobs for the years post 2000. The Analysis states “potential job impacts under NOx and SOx RECLAIM for the post-2000 time frame cannot be fully analyzed, since Tier 1-type control measures and associated compliance costs cannot be defined
 
 *63
 
 for controls to be implemented in the year 2000 and beyond.” Therefore, a partial analysis was performed by extending to the year 2005 the costs associated with the required reductions up to the year 1999, and analyzing them under the REMI model. This procedure revealed the “command and control” rules would cause an annual loss of 6,075 jobs for the years 1994-2005. In contrast, RECLAIM was only expected to cause an annual loss of 3,723 jobs over the same time period. However, the Analysis noted these predictions should be interpreted with caution because, of necessity, speculative input data was used in the economic models.
 

 In its Analysis, the SCAQMD also evaluated (for the period 1994-2000) six alternatives to RECLAIM, but concluded RECLAIM provided “the best balance of emission reductions, the size of universe, and economic impacts.”
 

 Our independent review of the Analysis reveals the SCAQMD did comply with the applicable Health and Safety Code provisions by analyzing data
 
 to the extent it was available.
 
 As provided in Health and Safety Code section 40728.5, “Whenever a district intends to propose ... a rule . . . , that agency shall,
 
 to the extent data are
 
 available, perform an assessment of the socioeconomic impacts . . . of the rule .... The district board shall actively consider the socioeconomic impact of regulations and make a good faith effort to minimize adverse socioeconomic impacts . . . .”
 
 [4]
 
 (Italics added.)
 

 
 *64
 
 We construe Health and Safety Code section 40728.5 to establish a realistic requirement for these socioeconomic studies. Neither this section nor any other precludes issuance of antipollution rules until data exist allowing a precise analysis of the socioeconomic impacts of those proposed rules.
 
 [5]
 
 Instead the controlling law allows rules to come into effect after considering those impacts which can be projected given “available data.” The relevant date for determining the availability of data obviously is when the experts are conducting the study, generally in the period before the rules are adopted. When insufficient data are available to make a reasonable projection of socioeconomic impact the SCAQMD remains empowered to adopt regulations. Only when it can be shown the needed data were available but not used in the study or when the SCAQMD failed to even attempt a study of socioeconomic effects can this requirement bar adoption of a rule or program designed to reduce pollution. Appellants make no claim data exist which would have allowed a precise projection of socioeconomic effects in the post-2000 period.
 

 The SCAQMD considered in detail the socioeconomic impacts of RECLAIM for the years of 1994-1999. As noted earlier, the SCAQMD’s
 
 *65
 
 Analysis discussed RECLAIM’S effect on businesses, employment and the economy. In addition, it listed probable costs and alternatives, discussed RECLAIM’S emission reduction potential and focused on the necessity of adopting RECLAIM to attain state ambient air standards.
 

 As to the post-2000 period, we conclude the SCAQMD’s Analysis did provide an assessment of RECLAIM’S socioeconomic impacts “to the extent data were available.” Indeed it was a reasonably precise assessment given the limitations of the data available at the time the studies were undertaken. This is all which could be reasonably expected and all the applicable laws require. It would be impossible to devise a long-range air pollution control program if the legality of that program depended upon the ability to make precise assessments of future socioeconomic effects based on data and processes which are not yet available.
 

 We further observe the SCAQMD rules provide for a more sensible way of devising and managing a long-range plan than requiring impossibly precise predictions of the future at the outset. As described earlier (see p. 60,
 
 ante),
 
 the SCAQMD is required to conduct annual reviews and comprehensive triennial audits which include assessments of technological improvements and adverse socioeconomic effects, among other factors. This allows for mid-course corrections based on practical experience and newly available data.
 

 For these reasons, we conclude the SCAQMD complied with statutory requirements in its assessment of future socioeconomic effects.
 

 II.
 
 The Trial Court Properly Found the SCAQMD’s Environmental Analysis Was Sufficient.
 

 The SCAQMD prepared an EA, as required by CEQA, to analyze any possible adverse environmental effects which might occur from RECLAIM. Appellants contend the SCAQMD’s EA failed to sufficiently examine RECLAIM’S impacts for the years after 2000 when the plan anticipated the tier II technologies would be in place. The SCAQMD however opines it cannot analyze environmental effects for the years post 2000 if technology does not exist to do so. Further, it asserts any analysis conducted would be speculative and CEQA dictates that if an analysis of an impact would be speculative, the SCAQMD must not undertake it.
 

 The EA the SCAQMD prepared supports the position it is not required to undertake an analysis (for the environmental effects of RECLAIM for years
 
 *66
 
 post 2000) because it would have been speculative to do so. Throughout the EA, the SCAQMD finds the pollution control technologies and costs which will be used for the post-2000 period are simply unknown.
 

 The EA prepared by the SCAQMD states: “The trading model only evaluates implementation of Tier I control technologies because costs cannot be assigned to unknown technologies. The analysis in this EA will also follow this convention because it would require substantial speculation as defined by CEQA, to predict future unknown technologies and any impacts they may generate.”
 

 The EA further provides: “It should be noted that the emissions trading model does not model the NOx and SOx RECLAIM market after the year 2000. Part of the reason is that, according to the AQMP, after the year 2000, Tiers II and III control technologies begin to emerge. Since Tiers II and III control technologies will require a significant advancement in current technological applications or completely new types of technologies, some Tiers II and III control technologies cannot be specifically identified and, therefore, costs cannot be assigned.”
 

 In their brief, appellants themselves concede CEQA guidelines provide the SCAQMD is relieved of its duties, “if, after thorough investigation, a particular impact is too speculative for evaluation.” (Citing Cal. Code Regs., tit. 14, § 15145.) They further concede a state agency is not expected to foresee the unforeseeable. In our view, requiring the SCAQMD to make the assessments appellants desire would mandate the SCAQMD to predict the unforeseeable.
 

 At least two prior cases support the SCAQMD’s position that analysis of the environmental impacts for the years post 2000 would require speculation and thus need not be included in the environmental assessment.
 

 In
 
 Marin Mun. Water Dist.
 
 v.
 
 KG Land California Corp.
 
 (1991) 235 Cal.App.3d 1652 [1 Cal.Rptr.2d 767], the Marin Municipal Water District declared a water shortage emergency and imposed a moratorium on new service areas, pending the development of new water supplies. The district issued an environmental impact report (EIR) stating the anticipated restriction would have no significant adverse environmental effects. Developers challenged the EIR by seeking writs of mandate and declaratory relief. They claimed the EIR failed to adequately analyze the adverse environmental effects of the moratorium or to consider feasible alternatives.
 
 (Id.
 
 at p. 1659.)
 

 In actuality, the EIR addressed the possible economic and social impact of the moratorium and concluded any such impact would not be felt for several
 
 *67
 
 years. (235 Cal.App.3d at p. 1663.) Furthermore, the district in its EIR refused to speculate about potential environmental effects which might occur from any long-term economic or social changes. The Court of Appeal held that, “[g]iven the unique nature of the project under consideration, this analysis was legally adequate.”
 
 (Ibid.)
 
 For if the “nature of future development is nonspecific and uncertain, an EIR need not engage in ‘sheer speculation’ as to future environmental consequences.”
 
 (Id.
 
 at p. 1662.) This sentiment is further expressed by section 15145 of the CEQA Guidelines which states, “if, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact.” (235 Cal.App.3d at p. 1662, citing Cal. Code Regs., tit. 14, § 15145.)
 

 When applying
 
 Marin
 
 to the present case, we conclude the SCAQMD’s failure to predict RECLAIM’S future environmental impacts for the years post 2000 was proper because any efforts to assess the impacts of unknown and unknowable technology would be pure speculation.
 

 Finally, in
 
 Laurel Heights Improvement Assn.
 
 v.
 
 Regents of University of California
 
 (1993) 6 Cal.4th 1112 [26 Cal.Rptr.2d 231, 864 P.2d 502], the court addressed the issue of what constitutes significant new information in a final EIR so as to require its recirculation for public comment before certification.
 
 [6]
 
 In considering the cumulative effect of the plan’s toxic emissions in the Laurel Heights area, the Regents’ draft EIR stated “ ‘there are no accepted methodologies or standards by which to quantitatively measure the cumulative toxic emission impacts of all potential sources of toxic air emissions in the Laurel Heights vicinity. . . .’”
 
 (Id.
 
 at p. 1137.) Therefore, the draft EIR concluded “ ‘the potential cumulative impacts of toxic air emissions are too speculative for evaluation.’ ”
 
 (Ibid.)
 
 The final EIR the Regents prepared also adopted the same conclusion.
 
 (Id.
 
 at p. 1138.) The California Supreme Court held such a conclusion was authorized by CEQA Guidelines, title 14, California Code of Regulations, section 15145 (previously quoted above). (6 Cal.4th at p. 1137.)
 

 Similarly, in the present case, it follows the SCAQMD should not be mandated to undertake an environmental analysis under CEQA, because it would be speculative to do so. Any such assessment here would be at least as speculative as the ones the courts found speculative and thus unnecessary in
 
 Marin
 
 and
 
 Laurel Heights.
 
 We further observe that once again the SCAQMD’s rules call for annual reviews and triennial audits which, among
 
 *68
 
 other things, will assess adverse environmental effects from new technology and other actual experience in implementing the plan.
 

 Accordingly, we agree with the trial court in finding the SCAQMD properly complied with applicable law in not conducting an analysis of the environmental effects of unknown tier II technologies on the years beyond 2000.
 

 Disposition
 

 The judgment is affirmed. Costs on appeal are awarded to respondent.
 

 Woods, J., and Neal, J., concurred.
 

 A petition for a rehearing was denied January 15, 1998, and appellants’ petition for review by the Supreme Court was denied March 25, 1998.
 

 [1]
 

 For a discussion of emissions trading in concept and practice see Johnson and Pekelney,
 
 Economic Assessment of the Regional Clean Air Incentives Market: A New Emissions Trading Program for Los Angeles
 
 (1996) 72 Land Econ. 277, 281. There, the authors explain, “The fundamental change in RECLAIM compared to the existing [‘command and control’] regulatory structure is that polluting facilities will be regulated in how much they can emit, but not how they must achieve required emissions reductions. Each facility is allocated a designated number of RECLAIM Trading Credits, each worth one pound of a specific pollutant in a specific year. In any specified year, a facility may not emit to the atmosphere any more of a specific pollutant than the number of that year’s RTCs for that pollutant that the facility holds. RTCs not applied in their designated year cannot be utilized in later years (no banking), preventing the possibility of extreme ozone episodes in the future. The allocation of RTCs declines each year at a facility-specific rate equivalent to the average reductions that would have been achieved under the AQMP’s plan to implement [‘command and control’] regulations. . . .” (Fn. omitted; see also Comment,
 
 Reforming Environmental Law
 
 (1985) 37 Stan.L.Rev. 1333 [arguing economic incentives are necessary to promote innovation in the development and adoption of environmentally superior technologies, as well as programs such as an auction system].)
 

 [2]
 

 Appellants refer to the post-2000 years as the “out-years” and the 1994-1999 years as the “in-years.” But other than the change in century and millennium the only distinguishing characteristic of the years 2000 and beyond is the fact those years anticipated tier II technology in the original 1991 SCAQMD “command and control” plan and now also in the RECLAIM program.
 

 [3]
 

 For a full explanation of the model, see Johnson and Pekelney,
 
 Economic Assessment of the Regional Clean Air Incentives Market: A New Emissions Trading Program For Los Angeles, supra,
 
 72 Land Econ. 277.
 

 [4]
 

 Health and Safety Code section 40728.5 provides:
 

 “(a) Whenever a district intends to propose the adoption, amendment, or repeal of a rule or regulation that will significantly affect air quality or emissions limitations, that agency shall,
 
 to the extent data are available,
 
 perform an assessment of the socioeconomic impacts of the adoption, amendment, or repeal of the rule or regulation. The district board shall actively consider the socioeconomic impact of regulations and make a good faith effort to minimize adverse socioeconomic impacts, as defined below. This section does not apply to the adoption, amendment, or repeal of any rule or regulation that results in any less restrictive emissions limit if the action does not interfere with the district’s adopted plan to attain ambient air quality standards, or does not result in any significant increase in emissions.
 

 “(b) For purposes of this section, ‘socioeconomic impact’ means the following:
 

 “(1) The type of industries or business, including small business, affected by the rule or regulation.
 

 “(2) The impact of the rule or regulation on employment and the economy of the region affected by the adoption of the rule or regulation.
 

 “(3) The range of probable costs, including costs to industry or business, including small business, of the rule or regulation.
 

 “(4) The availability and cost-effectiveness of alternatives to the rule or regulation being proposed or amended.
 

 “(5)The emission reduction potential of the rule or regulation.
 

 “(6) The necessity of adopting, amending, or repealing the rule or regulation to attain state and federal ambient air standards pursuant to Chapter 10 (commencing with Section 40910).
 

 “(c) This section does not apply to any district with a population of less than 500,000 persons.
 

 “(d) Upon the approval by a majority vote of the district board, a county district is not required to include the analysis specified in paragraphs (2) and (4) of subdivision (b) in any
 
 *64
 
 assessment of socioeconomic impacts for any rule or regulation that only adopts a requirement that is substantially similar to, or is required by, a state or federal statute, regulation, or applicable formal guidance document. Examples of state or federal formal guidance documents include, but are not limited to, federal Control Techniques Guidelines, state and federal reasonably available control technology determinations, state best available retrofit control technology determinations, and state air toxic control measures.” (Italics added.)
 

 [5]
 

 We observe Health and Safety Code section 40440.8, addressed to the SCAQMD specifically and requiring a socioeconomic study, likewise contains the limiting language—“to the extent data are available.”
 

 Health and Safety Code section 40440.8 provides in pertinent part:
 

 “(a) Whenever the south coast district intends to propose the adoption, amendment, or repeal or a rule or regulation that will significantly affect air quality or emissions limitations, the district shall,
 
 to the extent data are available
 
 from the district’s regional economic model or other sources, perform an assessment of the socioeconomic impacts of the adoption, amendment,
 
 or
 
 repeal of the
 
 rule
 
 or regulation.
 

 “(b) For the purposes of this section ‘socioeconomic impact’ means only the following:
 

 “(1) The type of industries affected by the rule or regulation.
 

 “(2) The impact of the rule or regulation on employment and the economy in the south coast basin attributable to the adoption of the rule or regulation.
 

 “(3) The range of probable costs, including costs to industry, of the rule or regulation.
 

 “(4) The availability and cost effectiveness of alternatives to the rule or regulation, as determined pursuant to Section 40922.
 

 “(5) The emission reduction potential of the rule or regulation.
 

 “(6) The necessity of adopting, amending, or repealing the rule or regulation in order to attain state and federal ambient air standards pursuant to Chapter 10 (commencing with Section 40910).” (Italics added.)
 

 [6]
 

 The EIR was prepared by the Regents regarding its plan to relocate a university biomedical research unit.