[No. B131122. Second Dist., Div. Two. Jan. 30, 2001.]

THE SHERWIN-WILLIAMS COMPANY, Plaintiff, v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT et al.,
Defendants.

NATIONAL PAINT & COATINGS ASSOCIATION, Plaintiff, v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT,
Defendant.

SMILAND PAINT COMPANY et al., Plaintiffs and Appellants, v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT et al.,
Defendants and Respondents.

1260

---

## COUNSEL

Smiland & Khachigian, William M. Smiland and Christopher G. Foster for Plaintiffs and Appellants.

Daniel P. Selmi; Peter M. Greenwald, Barbara Baird and William B. Wong for Defendant and Respondent South Coast Air Quality Management District.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Douglas B. Noble, Deputy Attorney General, for Defendant and Respondent California Air Resources Board.

---

## OPINION

**NOTT, Acting P. J.**—One of Southern California's major assets is having an outstanding climate. However, everything in life seems to come with a price tag. The great fortune in having such good weather has encouraged a large population dependent on fossil fuel-based transportation and a variety of industrial and business operations that emit airborne pollutants. Those factors have been a major cause of unhealthy air quality in many parts of Southern California.

Architectural coatings, such as paints containing certain ingredients, have been found to substantially contribute to air pollution. As a result, various federal, state and local government agencies have undertaken to control the use of environmentally harmful architectural coatings.

The present case involves the action by a local agency to promulgate rules to gradually reduce the use of flat paint containing components that pollute the air. Some members of the paint industry have challenged a recent amendment to those rules as being improperly enacted.

For the benefit of those readers who venture further, located at the end of this opinion is a glossary. It is our hope the glossary will be of assistance as a quick reference to keep straight the alphabet soup of acronyms that are inevitably used in this and other cases dealing with environmental law.

Appellants Smiland Paint Company, Triangle Coatings, Inc., Trinity Coatings Company, Apex Painting Company, Deft, Inc., Gemini Coatings, Inc., Life Paint Corporation, Murphy Industrial Coatings, Ram-Mar Painting, Inc., Textured Coatings of America, Inc., Vista Paint Corporation, Ferrell-Calhoun Paint, Conejo Paint Center, Knights Paint, Valley Paint, Elliott Paint, Supreme Paint, Mark's Paint, and R & L Paint and Wallpaper appeal from a judgment entered against them and in favor of respondents the South Coast Air Quality Management District and the California Air Resources Board.

We will here address the question of whether the South Coast Air Quality Management District (SCAQMD) complied with the dictates of Health and Safety Code section 40922 when it adopted amendments to one of its own rules, and conclude that it did. Moreover, we find that the SCAQMD complied with Health and Safety Code section 40440, subdivision (e), section 40703, and former section 40440.8 in preparing requisite studies regarding restrictions on the content of paint.

We also hold that the California Air Resources Board's (ARB) actions in approving the aforesaid amendments for inclusion in the state implementation plan did not constitute "state regulations" for purposes of the Administrative Procedure Act, or constitute a "project" for purposes of the California Environmental Quality Act.

### CONTENTIONS

Appellants contend that: (1) the SCAQMD violated the mandates of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; hereafter CEQA) and Health and Safety Code, division 26; (2) the ARB violated the mandates of the Administrative Procedure Act (Gov. Code, § 11340 et seq.; hereafter APA) and CEQA; and (3) the cause of action challenging the authority of the SCAQMD and the ARB to regulate paints should have been tried.

### FACTS

The paint industry has extensively litigated attempts by the SCAQMD and other agencies to regulate harmful effects of paints on the environment in such unpublished cases as: *Dunn-Edwards Corp. v. Technical Review Group* (May 22, 1996, B077371), and *Dunn-Edwards Corp. v. South Coast Air Quality Management Dist.* (Jan. 23, 1998, B090785). (Evid. Code, §§ 459, 452, subd. (d)(1).) We also note that appellants have brought lawsuits based on the regulations and amendments pertaining to volatile organic compound emissions, resulting in the following published opinions: *Dunn-Edwards*

*Corp. v. South Coast Air Quality Management Dist.* (1993) 19 Cal.App.4th 519 [24 Cal.Rptr.2d 90] and *Dunn-Edwards Corp. v. South Coast Air Quality Management Dist.* (1993) 19 Cal.App.4th 536 [24 Cal.Rptr.2d 99].

Appellants are paint manufacturers, contractors, and retail dealers of architectural coatings, including paints. The ARB is the California state agency required by the federal Clean Air Act (42 U.S.C. § 7401 et seq.; hereafter CAA) to adopt and submit to the United States Environmental Protection Agency (EPA) a state implementation plan (SIP) designed to implement, maintain, and enforce national ambient air quality standards (NAAQS) established under the CAA. The SCAQMD conducts the primary planning, rulemaking, and enforcement activities at the local level, and adopts regulations to control sources of air pollution in Los Angeles, Orange, Riverside, and San Bernardino Counties.

Through adoption of a local plan, air pollution control districts monitor a standard, promulgated by the EPA in 1979, regarding ozone emissions. Air pollution control districts have initiated statewide rules and regulations that typically have been amended to extend deadlines for compliance and have been approved by the ARB and EPA for inclusion in the SIP. In 1977, the SCAQMD adopted rule 1113, "Architectural Coatings" (Rule 1113).

Ozone is formed by photochemical reactions involving oxides of nitrogen and numerous volatile organic compounds (VOC or VOC's). Significant sources of VOC emissions are architectural coatings, including ordinary house paint. Architectural coatings emitted approximately 60 tons per day of VOC's in the south coast basin in 1996, and are expected to emit over 80 tons per day by the year 2010. In 1996, the following companies offered zero-VOC flat coatings to the public: The Glidden Company, Benjamin Moore Paints, American Formulators Manufacturers, Republic Paints, Non-ToxiCA, Inc., Richards Paints, Bruening Paints, Miller Paint, Rodda Paints, and Frazee Paints.

In April 1996, the SCAQMD proposed to lower the VOC limits for flat paints from 250 grams/liter (g/l) to 50 g/l by January 1, 1998. Responding to industry concerns, however, the SCAQMD proposed interim and final regulatory limits of 100 and 50 g/l, with extended compliance times to meet both limits.

In early October 1996, the SCAQMD completed a document entitled "Draft Staff Report for: Proposed Amendments to Rule 1113-Architectural Coatings" (SR). The report indicated that the proposed amendments to Rule 1113 decreased VOC limits for flat, traffic (paint applied to roadways),

multicolor and lacquer coatings, and temporarily increased VOC limits for fireproofing, japans (decorative paint), and magnesite cement coatings to reflect current technology. The amendments also implemented a portion of the Air Quality Management Plan (AQMP) control measure for architectural coatings. Under the amendments, manufacturers could average VOC content over different types of flat paints and sell and use noncompliant coatings inventory for three years after the compliance date.

On October 11, 1996, the SCAQMD's governing board began public hearing on the adoption of proposed amended Rule 1113, summarizing the industry's concerns and the SCAQMD's responses. At the industry's request, the board agreed to schedule another hearing a month later to allow the appellants time to review the proposed amendments and supporting documentation, which included the final subsequent environmental assessment (FSEA) and the final socioeconomic impact assessment (FSIA). Prior to that hearing, the SCAQMD staff faxed a proposal to members of the industry exempting small business manufacturers from the 50 g/l limits on flats. The SCAQMD consulted with Environmental Legislative Regulatory Advocacy Program (a trade association composed of members of the appellants), the Painting and Decorating Contractors Association, National Paint & Coatings Association, and many other paint manufacturers and contractors. The SCAQMD met seven times with the industry working group, which included representatives of appellants, to assist in the development of amended Rule 1113. The SCAQMD conducted three public workshops to obtain further public comment on the proposed rule amendments.

On November 8, 1996, the SCAQMD convened the additional hearing and received additional testimony on the proposed rule. At the end of the hearing, the board adopted amended Rule 1113, certified the FSEA and approved the FSIA. The amendments to Rule 1113 provided until July 1, 2001, for coatings to reach a VOC content of 100 g/l and until July 1, 2008, to reach a VOC content of 50 g/l.

### Procedural Background

This case is the result of a consolidation of three cases. (1) The Sherwin-Williams Company (Sherwin-Williams) filed a petition for writ of mandate and complaint against the SCAQMD (case No. BC162162) based on the SCAQMD's amendment of its Rule 1113, alleging causes of action for violation of requirements of certified regulatory program, writ of mandate for failure to perform mandatory duty, and declaratory relief. (2) National Paint & Coatings Association filed a petition for writ of mandate and

complaint for injunctive and declaratory relief against the SCAQMD (case No. BC162231) based on the SCAQMD's amendment of its Rule 1113, alleging causes of action for violation of CEQA, declaratory relief for invalid rulemaking, and violation of substantive due process. (3) Dunn-Edwards Corporation (Dunn-Edwards) and appellants filed a petition for writ of mandate and complaint for injunctive and declaratory relief and damages against the SCAQMD and the ARB (case No. BC178414).

The trial court severed for two separate trials all claims pertaining to the adoption by the SCAQMD of its amended Rule 1113 and the remaining claims relating to the adoption by the SCAQMD of its 1997 AQMP, which amended the 1994 architectural coatings control measure.

On January 7, 1998, and August 19, 1998, the trial court concluded trials of claims raised by Sherwin-Williams and National Paint & Coatings Association. The trial court entered partial judgment adjudicating all issues pertaining to the challenged lacquer and flat VOC limits in favor of the SCAQMD. On January 14, 1999, trial was conducted on the remaining claims brought by Dunn-Edwards and appellants.

The trial court found that the SCAQMD adequately responded to the significant environmental questions raised by Dunn-Edwards, Sherwin-Williams, and National Paint & Coatings Association and did not abuse its discretion in adopting amended Rule 1113 or in adopting the amended architectural coatings control measures in its 1997 AQMP. The trial court found that the SCAQMD considered and rejected petitioners' contention that consumers would use other coatings or application methods that would cause more pollution. The trial court also found that the SCAQMD made a genuine effort to consider and address all the objections and suggestions of the petitioners. Further, the SCAQMD considered the socioeconomic impact of regulation changes and attempted to minimize them.

As to Dunn-Edwards's and appellants' challenge to the SCAQMD's adoption of its 1997 AQMP amendments to the architectural coatings control measure, the trial court found that the SCAQMD adequately analyzed and reported upon the environmental impact of the change that it was proposing in adopting the amendments. The trial court found that in challenging the 1997 AQMP amendments, appellants conceded that they did not challenge the underlying and more rigorous 1994 AQMP architectural coatings measure.

The trial court rejected Dunn-Edwards's and appellants' contention that the SCAQMD violated Health and Safety Code sections 40910, 40913 and

40922[1] by failing to consider the amended control measure's cost effectiveness, technological feasibility, and public acceptance. The trial court found that the SCAQMD considered all three factors in its extensive review process for the 1997 AQMP. The trial court also dismissed Dunn-Edwards's 20th and 21st causes of action, for declaratory relief and damages respectively, because they merely requested other remedies based upon the same facts.

The trial court held that the ARB's adoption of the SCAQMD's Rule 1113 amendments and 1997 AQMP, and the inclusion of them in the SIP did not constitute the adoption of regulations pursuant to section 39601 and therefore did not require compliance with the APA. The trial court found that the ARB was not required to hold a public hearing prior to its adoption of the Rule 1113 amendments nor was its adoption of either the Rule 1113 amendments or the 1997 AQMP procedurally defective under any of the theories alleged by Dunn-Edwards for a violation of CEQA.

The trial court dismissed the various petitions for writ of mandate and complaints for injunctive and declaratory relief filed by Sherwin-Williams, National Paint & Coatings Association, and Dunn-Edwards and appellants.

The aforementioned parties filed this appeal with the exception that Sherwin-Williams, National Paint & Coatings Association, and Dunn-Edwards[2] did not appeal from the judgment.

DISCUSSION

1. *Whether the SCAQMD violated section 40922, subdivision (b) in compiling the SR, FSIA and FSEA*

■ "In reviewing [non-CEQA] quasi-legislative decisions, the trial court does not inquire whether, if it had power to act in the first instance, it would have taken the action taken by the administrative agency. The authority of the court is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786 [187 Cal.Rptr. 398, 654 P.2d 168].) Our review is under the same standard. (*Ibid.*)

CEQA claims arise under the Public Resources Code, and our first discussion concerns non-CEQA claims arising under the Health and Safety

---

[1] All subsequent code section references are to the Health and Safety Code unless otherwise indicated.

[2] Wellborn Paint Corporation, a party below, also did not appeal the judgment.

Code. Appellants urge that the SCAQMD failed to meet the requirements of section 40922, subdivision (b), in that neither the SR, the FSIA, nor the FSEA, generated in the adoption of the amendments to Rule 1113, reflected any consideration of the "public acceptability" of the restrictions on VOC's in the years 2001 and 2008. Despite the fact that the amendments merely regulate the content of the VOC's in the flats, appellants characterize these amendments to Rule 1113 as "prohibitions" of flat paints, and sometimes simply refer to these amendments as "flat bans." The SCAQMD, on the other hand, contends that the amendments to Rule 1113 were not subject to section 40922, subdivision (b) and in any event, the SCAQMD complied with those requirements.

The pertinent statutes, as raised by the parties' arguments, are sections 40440, subdivision (e), 40703, 40922, and 40920.5. Section 40922, subdivision (a) provides: "Each plan prepared pursuant to this chapter shall include an assessment of the cost effectiveness of available and proposed control measures and shall contain a list which ranks the control measures from the least cost-effective to the most cost-effective." Section 40922, subdivision (b) requires that "In developing an adoption and implementation schedule for a specific control measure, [the SCAQMD] shall consider the relative cost effectiveness of the measure, as determined under subdivision (a), as well as other factors including, but not limited to, technological feasibility, total emission reduction potential, the rate of reduction, public acceptability, and enforceability."[3]

Appellants urge that section 40922 controls the content of the documents prepared by the SCAQMD and is applicable through sections 40703 and 40440, subdivision (e). Under section 40440, subdivision (e), the SCAQMD must comply with section 40703 in adopting any regulation. Section 40703 states: "In adopting any regulation, the district shall consider, *pursuant to Section 40922*, and make public, its findings related to the cost-effectiveness of a control measure." (Italics added.) Appellants thereby contend that section 40922 was incorporated in its entirety into section 40703, including the requirement that the SCAQMD conduct proper commercial or technological assessments.

The Health and Safety Code statutes are a complex morass of interrelated and cross-referenced statutes, and it is difficult to determine whether section 40922 actually applies to the *amendment* of regulations. The SCAQMD makes several good arguments as to why section 40922 does not apply. If

---

[3]Neither party addressed the issue of whether the subject amendments constituted an "implementation schedule" under section 40922, subdivision (b).

section 40703 is read without the modifying clause "pursuant to section 40922," it seems only to require that the district consider, and make public, "its findings related to the cost effectiveness of a control measure"—it does not incorporate the entirety of section 40922. Section 40703 makes no reference to the other requirements set forth in section 40922, subdivision (b), which are technological feasibility, total emission reduction potential, the rate of reduction, public acceptability, and enforceability. Thus, it is unclear whether the district would be required to make public its findings related to the entirety of section 40922 as appellants suggest, or just to the control measure. Indeed, if we were to closely scrutinize the pertinent chapters of the Health and Safety Code it is arguable that the Legislature chose to distinguish between certain regulations which apply only to the initial *adoption* of regulations, and other regulations which apply to the *amendment, repeal,* as well as the initial *adoption* of existing regulations. For instance, section 40440, subdivision (e) requires the south coast district board to comply with section 40703 "[i]n *adopting* any regulation." (Italics added.) In contrast, subsequent code sections within the same chapter specify the less onerous steps through which the south coast district board must pass in order to *adopt, amend, or repeal* any rule or regulation relating to an air quality objective. However, we believe that such an analysis is overly technical. Although, as a general proposition, the process of amending rules should pass through fewer hoops than the process of adopting a rule, it is possible that an amendment could impose standards substantially more onerous than the original rule, and should require just as much oversight and review as the initial adoption of a rule.

The SCAQMD also argues that section 40922, subdivision (b) does not apply when regulations are amended because section 40920.5 states that in order to meet the requirements of the plan developed by the SCAQMD, a "stationary source control program" shall be included in the "attainment plan." The SCAQMD contends that "stationary source control programs," which are specific control measures, refer to the plans, and that· section 40922, subdivision (b) applies only to "plans" developed by the SCAQMD, and not the adoption of district rules. However, section 40922, subdivision (b) refers to the development of "an adoption and implementation schedule," which would seem to refer to regulations such as the one at issue.

■ We believe that the most reasonable interpretation of section 40922 is that it applies to the SCAQMD's planning processes and adoption of its AQMP. Section 40922, subdivision (b) states that "In developing an adoption and implementation schedule for a specific control measure, the district shall consider the relative cost effectiveness of the measure, as determined

under subdivision (a), as well as other factors including, but not limited to, technological feasibility, total emission reduction potential, the rate of reduction, public acceptability, and enforceability." In other words, section 40922, subdivision (b) directly references the adoption and implementation schedule for a plan.

Although we conclude that section 40922 applies, the matter does not end here. The SCAQMD urges that even if section 40922, subdivision (b) applies, appellants are raising this issue for the first time on appeal, since they never challenged the 1994 AQMP, which included an adoption and implementation schedule. We agree, since the issue raised before the trial court by appellants was whether the SCAQMD considered cost effectiveness, technological feasibility, and public acceptance in adopting its 1997 AQMP amendments to the architectural coatings control measure. In connection with that issue, the trial court found that the SCAQMD's extensive review process for the 1997 AQMP satisfied section 40922's requirement that the SCAQMD consider the public acceptability of the amended architectural coatings control measures.

The record shows that resolution No. 96-22 of the governing board of the SCAQMD certifying the FSEA for the proposed amendments to Rule 1113, and amending Rule 1113 declared that the 1994 AQMP contained a control measure, No. 94CTS-07 (CTS-07), which proposed amended Rule 1113 partially implemented and for which an environmental impact report (EIR) was prepared and certified. The record further shows that the 1994 AQMP had included an adoption and implementation schedule for control measure CTS-07, which provided implementation between the years 2001 and 2006. The 1994 AQMP control measures had been evaluated by the following criteria: cost effectiveness; efficiency; emission reduction potential; enforceability; equity; legal authority; public acceptability; rate of emission reduction; and technological feasibility. The record shows no evidence that appellant ever challenged the 1994 AQMP or the adoption and implementation schedule for CTS-07. In any event, the SCAQMD contends that in essence, the SR, FSIA and FSEA complied with section 40922, subdivision (b). In complying with the mandates of CEQA (as we discuss in pt. 3, *post*), the SCAQMD considered technological feasibility and public acceptability when it amended Rule 1113.

In their opposition, appellants attempt to pigeonhole the facts of the instant case into the holding of *Alliance of Small Emitters Metals Industry v. South Coast Air Quality Management Dist.* (1997) 60 Cal.App.4th 55, 60-63 [70 Cal.Rptr.2d 54] (*Alliance*) authored by Division Seven of this district.

*Alliance*'s holding that the Health and Safety Code establishes a "realistic requirement for these socioeconomic studies" (*id.* at p. 64) is generally supportive of the SCAQMD's rulemaking and planning duties. That is, the SCAQMD must consider the impact of the rules it adopts in light of available data. (*Ibid.*) The SCAQMD cannot be penalized for failing to predict future and environmental impacts that would require speculation based on unknown and unknowable technology. (*Id.* at p. 67.) Appellants latch onto the statement that "[o]nly when it can be shown the needed data were available but not used in the study or when the SCAQMD failed to even attempt a study of socioeconomic effects can this requirement bar adoption of a rule or program designed to reduce pollution." (*Id.* at p. 64.) Appellants use this statement as support for its proposition that the SCAQMD simply chose not to consider public acceptability in the FSIA and that the SCAQMD simply *assumed* that the lower VOC requirements were technologically feasible, instead of making a conclusion based on the SCAQMD's own data or using information provided by the industry. Yet, on appeal, appellants have not shown that data exists which the SCAQMD should have relied upon, but did not.

We conclude that the appellants never challenged the 1994 AQMP that included an adoption and implementation schedule for control measure CTS-07, which provided implementation between the years 2001 and 2006, and that in any event, the SCAQMD considered technological feasibility and public acceptability, in complying with the mandates of CEQA.

2. *Whether the FSIA complied with the requirements of sections 40703, 40440.8, and 40728.5*

Appellants attack the FSIA by complaining that the SCAQMD did not comply with sections 40440.8, 40728.5 and 40703, the statutes governing the SCAQMD's assessment of the socioeconomic impact of the amendments. These statutes are somewhat duplicative, and we will deal with them simultaneously.

At the time the FSIA was prepared, the applicable statutes subjected the analyses of the SCAQMD to rigorous oversight and review. Former section 40440.8 required the SCAQMD to perform an assessment of the socioeconomic impacts of the adoption or amendment of a rule, to the extent data are available. Under this section, the SCAQMD was required to study the impact of the adoption or amendment of the rule on the industries affected by the rule; employment and the economy; the range of probable costs, including costs to industry; the availability and cost effectiveness of alternatives to the

rule; the emission reduction potential of the rule; and the necessity of adopting or amending the rule in order to attain state and federal ambient air standards. (Former § 40440.8, subds. (a), (b).) Moreover, it was mandatory that the SCAQMD enter into a contract with an independent firm that was to perform a review and analysis of the methods by which the SCAQMD assessed socioeconomic impacts of district rules and regulations. (Former § 40440.8, subd. (c)(1).) That firm was required to evaluate the statistical models and data used by the district, the proficiency by which the data was applied, and issue recommendations for any improvements needed to ensure the accuracy and reliability of the assessments. The independent firm was to evaluate the SCAQMD's expertise in performing the assessments and whether the quality and accuracy of these assessments would be substantially improved if they were performed by an independent contractor. Former section 40440.8, subdivision (c)(3) provided that the analysis by the independent firm would be submitted to the Legislative Analyst for review and comment, then submitted to the Legislature and the Governor. The Legislative Analyst was also required to review the report and submit any comments to the Legislature and the Governor.[4]

Section 40728.5 requires the SCAQMD to perform an assessment of the socioeconomic impacts of the amendment of a rule and make a good faith effort to minimize adverse socioeconomic impacts. The SCAQMD must analyze (1) the type of industries affected by the rule; (2) the impact of the rule on employment and the economy; (3) the range of probable costs of the rule; (4) the availability and cost effectiveness of alternatives to the rule; (5) the emission reduction potential of the rule; and (6) the necessity of adopting, amending or repealing the rule to attain state and federal ambient air standards. As previously discussed, section 40703 requires the district to consider, pursuant to section 40922, and make public, its findings related to the cost effectiveness of a control measure.

---

[4]As amended in 1998, section 40440.8 currently reads: "(a) Whenever the south coast district intends to propose the adoption, amendment, or repeal of a rule or regulation that will significantly affect air quality or emissions limitations, the district, to the extent data are available from the district's regional economic model or other sources, shall perform an assessment of the socioeconomic impacts of the adoption, amendment, or repeal of the rule or regulation. [¶] (b) For the purposes of this section, 'socioeconomic impact' means only the following: [¶] (1) The type of industries affected by the rule or regulation. [¶] (2) The impact of the rule or regulation on employment and the economy in the south coast basin attributable to the adoption of the rule or regulation. [¶] (3) The range of probable costs, including costs to industry, of the rule or regulation. [¶] (4) The availability and cost-effectiveness of alternatives to the rule or regulation, as determined pursuant to Section 40922. [¶] (5) The emission reduction potential of the rule or regulation. [¶] (6) The necessity of adopting, amending, or repealing the rule or regulation in order to attain state and federal ambient air standards pursuant to Chapter 10 (commencing with Section 40910)."

We note that the requirement of an independent assessment of the expertise of the SCAQMD has been eliminated.

The record shows that the SCAQMD's methodology and expertise in assessing the socioeconomic impacts of the amendments was independently assessed and validated by the Massachusetts Institute of Technology (MIT). Moreover, the Legislative Analyst reported to the Legislature and Governor that MIT conducted an extensive analysis of the regional economic model used by the district in its socioeconomic analysis and that MIT concluded that it was technically sound. MIT found that the SCAQMD staff was well qualified to conduct socioeconomic analyses and proficient in their use of the regional economic model. The report reflected MIT's views that the staff was " 'extremely talented, with educational background and on-the-job experience that are the envy of smaller air pollution districts' " and sufficiently well trained in modeling methods. MIT concluded that the quality and accuracy of the assessments would not be substantially improved if the assessments were performed instead by a contractor, nor that potential bias would be eliminated by contracting with an independent firm. The Legislative Analyst's report concluded that the SCAQMD had adopted 17 out of 21 recommendations made by MIT to improve the SCAQMD's analysis.

Our review of the FSIA shows extensive documentation of socioeconomic impacts which can be summarized as follows: (1) the amendments would lower VOC limits; (2) the total cost impact from lowering the VOC limits was estimated at $14.5 million annually, when averaged over the 1998-2010 period; (3) 305 jobs would be forgone annually in the four-county area; (4) profit of the paint manufacturing industry in the four-county area was projected to decrease by .0098 percent and .012 percent in 2008 and 2010, respectively, relative to the national paint manufacturing industry; (5) the amendments could increase the price of construction services by .0564 percent and .0550 percent in 2008 and 2010, respectively; (6) there would be no cost impact from lowering the VOC limits of traffic coatings and multicolor coatings; and (7) industry would benefit from an averaging provision for flat coatings and a "sell-through" provision to allow remaining noncompliant inventory to be sold for three years after the compliance date.

Nonetheless, appellants urge that the SCAQMD did not consider the fact that product formulas are protected property interests and that formulas for first-class flats would become useless on July 1, 2001. We disagree with appellants' contention. First, appellants cannot assert a property right to emit VOC's. (*Mobil Oil Corp. v. Superior Court* (1976) 59 Cal.App.3d 293, 305 [130 Cal.Rptr. 814] [oil companies do not have a fundamental vested right to release gasoline vapors while dispensing fuel to their customers].) Nor have appellants shown that the product formulas are protected trade secrets, or if they are, that the amendments would force appellants to reveal them. The

amendments alter the amount of VOC's which can be used in product formulas, but use of the product formulas for first-class flats will simply not come to a dead stop, as appellants assert. The amendments allow manufacturers to phase in their reformulated formulas and average VOC content over different types of flat coatings. That is, the averaging provision allows the continued production of noncompliant coatings if their VOC emissions are offset by the production of other coatings which contain VOC's below their respective limits. Therefore, the formulas will not become valueless. Furthermore, since manufacturers may sell and use noncompliant coatings inventory for three years after the compliance date, the amendments provide adequate time for reformulation and ensure that research and development costs of reformulation can be spread over an extended period of time.

In any event, the FSIA found that the additional expenses for reformulated coatings would likely be passed on to homeowners and that small, niche-market manufacturers which already produce compliant coatings would enjoy an added competitive advantage relative to the national, mass-market coatings producers.

Appellants also complain that the SCAQMD made several conclusions based on incorrect assumptions, such as the assumption that all first-class flats could be reformulated as second-class flats with no increase in raw material cost. Yet appellants cite no data of their own indicating that the raw material costs would increase. According to the record, the SCAQMD solicited cost data from the impacted industries, but the paint industry refused to provide the necessary cost data upon which the SCAQMD could estimate costs in order to conduct its analysis. Lacking such data, the SCAQMD developed a surrogate method to estimate costs by determining if there were any significant price differences between low-VOC flat coatings already compliant with future VOC limits and traditional high-VOC flats. The only significant price differential noted by the SCAQMD was that flat coatings already reformulated to meet the 50 g/l limit cost $4 per gallon more than the traditional flat coatings. No price differential was noted for flat coatings already meeting the 100 g/l limit. Accordingly, the SCAQMD properly assumed an overall minor cost increase to the industry.

Appellants next complain that the SCAQMD ignored advice that substantial testing and marketing costs would be involved in reformulation of the paint, but cannot refute the SCAQMD's contention that the appellants merely advised the district of a cost impact and demanded further studies in order to prevent amendment of a rule. To give credibility to their argument, appellants should have, but did not, affirmatively demonstrate that the

needed data were available for the SCAQMD to conduct its studies. The SCAQMD's duty to analyze data is based on a rule of reasonableness under *Alliance, supra*, 60 Cal.App.4th 55, which requires it to utilize existing data available to it in order to make its projections. Appellants have not shown that the needed data were available but not used in the study, or that the SCAQMD failed to even attempt a study of socioeconomic effects, as is required to prove that the SCAQMD failed to fulfill the requirements of section 40440.8. In any event, the amendments do not operate in a vacuum. They provide for a technology assessment a year before either of the VOC limits take effect, at which time the SCAQMD is required to report to its board as to the appropriateness of maintaining the future VOC limit.

Next, despite appellants' dissatisfaction with the SCAQMD's assessment of the socioeconomic impact on small businesses, our review of the FSIA shows that it did analyze the effect of the amendments on small businesses. The FSIA reported on the impact on "both the manufacturers and the users (contractors, and 'do it yourself' consumers) of architectural coatings. The amendments could also potentially impact industries engaged in manufacturing paint, varnishes, enamels and allied products . . . ; adhesives and sealants . . . ; coating and engraving . . . ; and electroplating, polishing and coloring . . . . End users which are expected to be affected by the proposed amendments include consumers, and painting and paperhanging contractors . . . ." The FSIA stated that, depending on the definition of "small business," "most of the companies affected by the proposed amendments to Rule 1113 could potentially be small businesses." It noted, however, that the impact on small businesses would be minimized by a phasing-in of the amendments, which would mitigate sales losses and also spread out research and development costs over time. As previously mentioned, the averaging provision would allow the continued production of noncompliant coatings, and the sell-through provision providing a three-year period for the inventory of noncompliant coatings to be sold after the compliance deadline, would also benefit small businesses. Finally, an additional amendment proposed by the SCAQMD imposed an exemption for small business manufacturers so that the January 1, 2005 VOC limit for lacquers would not be applicable until January 1, 2007, and the July 1, 2008 VOC limit for flat coatings would not be applicable to any small business manufacturer within the definition set forth by the amendment. In any event, we note that the SCAQMD did not integrate a cost savings into its analysis as a result of that amendment, and therefore appellants have not been prejudiced thereby. Finally, the FSIA concluded that small local coating manufacturers with a market niche in performance coatings have a competitive advantage relative to the large, mass-market coatings producers.

Next, appellants interpret sections 40440.8 and 40728.5 as a mandate to the SCAQMD to analyze the anticompetitive impacts on the paint industry of the amendments, and contend that the SCAQMD has failed to do so. However, section 40440.8 defines socioeconomic impact as the type of industries affected by the rule, the impact of the rule on employment and the economy, and the range of probable costs. The mandates of section 40728.5 are similar, and contain no clear directive to analyze the anticompetitive impact on the paint industry. Assuming, however, that the SCAQMD must analyze the anticompetitive impacts of the amendments, we note that the FSIA contained a table outlining the impacts on profits of national industries of the proposed amendments. The FSIA also set forth a table outlining the impacts on selling prices of regional industries of the amendments. As previously noted, the FSIA concluded that small local coatings manufacturers have a market niche in performance coatings which would put them at a competitive advantage relative to the large, mass-market coatings producers. Thus, assuming the SCAQMD was required to analyze anticompetitive effects under section 40440.8, it has done so.

Appellants analyze the FSIA piecemeal, by addressing both the year 2001 and year 2008 flat limits separately, rather than as a whole. For instance, while appellants concede that the SCAQMD addressed the impact on employment of the year 2008 restriction, it claims it did not do so for the year 2001 restriction. As we read the FSIA, it complied with the mandates of sections 40440.8 and 40728.5. The FSIA set forth in a table the employment impact of the amendments both by industry and by year for the years 2000, 2005 and 2010. In a paragraph entitled "Impact on Employment and the Economy," after analyzing the relatively small number of jobs which will be forgone as a result of the VOC limits for lacquers, the report states that "In 2010, the number of jobs is 1,464 as a result of the 2008 VOCs limit for flats of 50 g/l. . . . [¶] Proposed Amendments to Rule 1113 is expected to result in approximately 305 jobs foregone [sic] annually, on average, between 1998 and 2010. Table 2 shows the estimated job impacts of the amendments by industry for the years 2000, 2005, and 2010 and the average annual job impacts between 1998 and 2010." The FSIA identified the most sensitive jobs as those in the construction sector and those sensitive to consumer spending such as eating, retail, wholesale, and medical establishments, as well as miscellaneous business and professional services. The report also noted that the chemicals sector is projected to add jobs, due to increased expenditures made on reformulated coatings. Appellants' criticism of the report does not persuade us that the report did not comply with the pertinent code sections.

We conclude that appellants have not shown that (1) needed data were available but were not used; or (2) the SCAQMD failed to even attempt

to complete the mandated study. Accordingly, the trial court did not err in concluding the SCAQMD complied with the requirements of the Health and Safety Code when it prepared and issued the FSIA.

### 3. Whether the FSEA omitted any analysis of adverse environmental impacts

Appellants contend that the FSEA generated by the SCAQMD omitted any analysis of environmental impacts.

■ " '[A] court's inquiry in an action to set aside an agency's decision under CEQA "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by · substantial evidence." ' [Citation.] The court does not pass upon the correctness of the documents' environmental conclusions, but only upon their sufficiency as informative documents. [Citation.]" (*Dunn-Edwards Corp. v. South Coast Air Quality Management Dist., supra,* 19 Cal.App.4th at p. 534.) A state agency need not respond to every comment raised in the review process, but must respond to the most significant environmental questions. (*Ibid.*) "All that is required is that the documents be responsive to the opposition [citations] and provide the members of the District board with information which enables them to make a decision which intelligently takes account of the environmental consequences." (*Ibid.*)

This issue falls under CEQA since it arises under former Public Resources Code section 21080.5. That statute, in effect at the time the amendments were adopted, provided that when the state certifies an environmental agency's regulatory program, the agency may submit a plan or other written documentation containing environmental information in lieu of the EIR typically required under CEQA. According to former Public Resources Code section 21080.5, subdivision (d)(3)(i), the plan shall "[i]nclude a description of the proposed activity with alternatives to the activity, and mitigation measures to minimize any significant adverse environmental impact."

In 1989, the state certified the SCAQMD's regulatory program, thus giving the SCAQMD the right to submit an abbreviated EIR. Appellants complain that the FSEA was deficient because it did not discuss (1) increased usage and reactivity impacts; or (2) a consumer preference shift from first- and second-class flats to various nonflats with higher VOC content between 350 and 420 g/l. Moreover, appellants assert that the SCAQMD's assumption that existing technology would be perfected in the future to prevent all adverse economic impacts was based on erroneous evidence.

Our general impression is that appellants are making arguments with no real underlying data to back them up, in order to force the SCAQMD to conduct additional analyses. Under *Dunn-Edwards Corp. v. South Coast Air Quality Management Dist., supra,* 19 Cal.App.4th at page 534, the SCAQMD is under no obligation to address every argument, but only the most significant environmental ones. The record shows that at the time the FSEA was generated, flat paints were available that complied with the future VOC limits propounded in the amendments. The product data sheets for those conforming flats showed that they were comparable to high-VOC flats in terms of durability, washability, scrubability, stain resistance, and priming requirements. On appeal, appellants attempt to discredit evidence relied upon by the SCAQMD, including a statement made by Tom Melody, a Glidden representative, to the effect that current zero-VOC flats do not have performance problems, and that zero-VOC coatings were technologically feasible. As the SCAQMD points out, any criticism made by Melody of the amendments concerned the time frame of the implementation of the limits. Those time frames were relaxed in the final rule that required compliance with a 50 g/l limit by 2008, rather than 1998, as first proposed. Moreover, the concerns of Robert Wendoll, a representative of the appellants, were based on the proposed amendments prior to the inclusion of longer lead times. The record is replete with other evidence that low- and zero-VOC flats are achievable during the time frame proposed in the amendments. Representatives from Sherwin-Williams and Hill Brothers stated that it would take only several years to evaluate new coatings technology and a few years before zero-VOC interior flats would reach the performance level of standard latex coatings. The evidence that the SCAQMD relied upon in reaching its conclusions included studies showing that performance-enhancing additives would create high performing low-VOC coatings, including flow and leveling agents to mitigate flow problems, pigment-wetting agents to assist in better dispersion of pigments, and defoamers and microfoam agents to mitigate bubble retention. Additionally, the technology used in attaining low-VOC coatings could also be used for development of zero-VOC coatings. Indeed, Glidden introduced the first generation of zero-VOC flat interior coatings in 1992. In 1996, Glidden introduced a zero-VOC flat exterior paint. By the end of 1996, nine other paint manufacturers were offering zero-VOC flat coatings.

Appellants' next claim that consumers will reject low-VOC flats is not supported by any evidence in the record. Rather, a comment letter from the Environmental Legislative & Regulatory Advocacy Program of the Southern California Paint & Coatings Association stated that consumers would be willing to accept some trade-offs in performance for odorless paints. At the

time the amendments were adopted, major national paint manufacturers had reported steadily increasing sales of zero-VOC flats, and the record shows evidence of testimonials by consumers of high-customer satisfaction with low- and zero-VOC flat coatings. Nor have appellants shown any evidence to support their contention that customers will instead turn to higher polluting nonflats.

Appellants also claim that the inferior performance of the low-VOC flats will lead to undesirable results, such as increased usage of primers, sealers, undercoats, and thinners, and more frequent repainting. Again, the record is replete with evidence that the paint manufacturers' data sheets demonstrate that low-VOC flats are comparable to high-VOC flats in terms of performance and desirability, undermining appellants' supposition that increased usage of primers, sealers, undercoats and thinners, as well as additional coatings will occur. Appendix G to the FSEA discusses the potential adverse impacts mentioned by the appellants and concludes that, as the table contained in the draft subsequent environmental assessment indicates, even in the worst case scenario, in which consumers turn to the use of alternative systems, a VOC emission reduction would still be achieved.

Finally, as to appellants' allegation that waterborne coatings contain compounds that are more reactive in producing ozone than the solvent-borne coatings, the SCAQMD properly relied on the opinion of a coatings industry expert that the usage impacts and the reactivity impacts do not apply to acrylic-based coatings, the bases of many low-VOC flats. Furthermore, at a 1991 joint conference on reactivity-based hydrocarbon controls, appellants' own representative noted in a paper presented at the conference that " 'reactivity is probably not a significant issue with regard to [waterborne flat coatings],' " since the VOC content of the waterborne flat coatings is so much less than the solvent-borne coatings they replace.

■ We conclude that the trial court was correct in its conclusion that appellants' lawsuit was primarily based on their disagreement with the conclusions of the SCAQMD. The SCAQMD performed its duties in an exemplary fashion and abided by the strictures of the Health and Safety Code. We disagree with appellants' contention that market forces should be left to drive the trend toward increasing the percentage of architectural coatings that are waterborne, and that government should not have a hand in regulating the content of paint. As appellants concede, the CAA delegated authority to the administrator of the EPA to issue air quality criteria for pollutants and to establish primary and secondary national ambient air quality standards for each listed pollutant at a level to protect the public

health and public welfare. Perhaps a coincidental increase in the percentage of the waterborne architectural coatings has occurred in the past 30 years. However, appellants cannot convince us that, left to itself, industry will take steps to safeguard the public health and public welfare by using less polluting but possibly more expensive technology.

4. *Whether the FSIA and FSEA appropriately analyzed alternatives and cost effectiveness*

Under sections 40440.8, subdivision (b)(4), 40728.5, subdivision (b)(4) and Public Resources Code sections 21102 and 21080.5, subdivision (d)(3)(i), the SCAQMD is required to assess the availability and cost effectiveness of alternatives.

Appellants' bare claim that the SCAQMD did not identify any alternatives to the year 2001 and year 2008 limits is contrary to the evidence in the record. Rather, the FSEA contains detailed analyses of five alternatives to the proposed rule amendments including air quality impacts, odor impacts, water impacts and health impacts. Moreover, the FSIA analyzed the cost effectiveness of each of the five alternatives.

Appellants focus instead on, in their words, the SCAQMD's failure to address appellants' recommended alternatives of (1) no action, (2) reformulation limit, or (3) seasonal advisory. In their reply brief, appellants refer to the administrative record to counter the SCAQMD's criticism that appellants never explained what they meant by their proposed "alternatives." Our examination of the administrative record cited to us does not shed any light on the three alternatives proposed by appellants, except to the extent that "no action" is self-explanatory, and that a reformulation limit is defined by appellants as "The most obvious alternative to the substitution limits [the SCAQMD] now proposed are the reformulation limit is now in effect." In other words, appellants' alternative recommendation of reformulation limit essentially means taking no action. In any event, appellants ignore the fact that in the FSEA, the SCAQMD analyzed the ramifications of an "Alternative A—No Project," which discussed the alternative of not adopting the proposed amendments to Rule 1113, but instead allowing the expiration of the current product variances for some of the coating categories, and maintaining the current version of Rule 1113 as amended by a 1990 court order.[5] Further, the record shows that at an initial meeting on March 14, 1996, with

---

[5] In 1990, the SCAQMD adopted amendments to Rule 1113 designed to abate emissions of VOC's relating to six coatings, which were challenged by Dunn-Edwards. The trial court determined the SCAQMD adequately addressed all environmental issues with respect to

appellants, the SCAQMD raised the issue of requiring lower VOC content coatings in the summertime and higher VOC content coatings in the winter when the smog forming potential is lower. At that meeting, appellants rejected that alternative. Its representatives raised their concerns that a seasonal regulation is not feasible because contractors would have to maintain twice the inventory, such a regulation would be impossible to enforce, coating operations could not be scheduled for specific seasons because of delays in new construction, and a public education program would be necessary. Accordingly, appellants cannot now complain that the SCAQMD did not address that alternative.

We conclude that the SCAQMD adequately analyzed a reasonable range of alternatives as it was required to do.

*5. Whether the 20th cause of action challenging the SCAQMD's and ARB's authority to regulate paints was properly dismissed*

■ Appellants contend that in their 20th cause of action, they sought a declaration that the SCAQMD's and ARB's policy of regulating the VOC content of paint was unlawful because paints are not sources of air pollution.[6] On appeal, appellants challenge the trial court's ruling that appellants' claim that the organic compounds in solvent-borne coatings are insufficiently reactive and the organic compounds in waterborne coatings are insufficiently volatile to contribute to ozone levels exceeding state or federal standards. Appellants disagree with the trial court's holding that "Since [appellants'] Twentieth cause of action rests upon these adversely adjudicated facts, that claim must also be adjudicated against them." Accordingly, appellants argue that the trial court erred by denying them the opportunity to present evidence that VOC's are innocuous.

First, we note that the 20th cause of action did not state a claim against the ARB, but was directed solely at the SCAQMD. On appeal, appellants cannot now attempt to bring the ARB into that cause of action as a defendant. As to

nonflat coatings, but ordered the SCAQMD to further study whether or not illegal thinning of coatings in the field resulted in a negative air quality impact before adopting the 1990 amendments as to the five other coatings. (*Dunn-Edwards Corp. v. South Coast Air Quality Management Dist., supra,* 19 Cal.App.4th at p. 522.)

[6]In their 20th cause of action for violation of statutory authority, appellants allege that: "Pursuant to California Health and Safety Code Sections 39002 and 4000, SCAQMD is authorized to control 'air pollution' from 'sources' other than vehicles. An unopened can of paint is not a 'source' of air pollution. Further, when opened, the VOC that evaporate do not constitute 'air pollution' but rather are simply the theoretical precursors to ozone formation. Thus, this statutory language does not give SCAQMD the authority to regulate the VOC content of Architectural Coatings or to ban coatings formulas."

its cause of action against the SCAQMD, appellants were properly precluded from introducing new evidence that the VOC's do not cause ozone pollution. Despite appellants' contention that they were entitled to introduce extra-record evidence, the California Supreme Court has held that "extra-record evidence can never be admitted merely to contradict the evidence the administrative agency relied on in making a quasi-legislative decision or to raise a question regarding the wisdom of that decision." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 579 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) On the other hand, substantial evidence supports the trial court's determination to the contrary, that paint VOC's do cause ozone pollution. This evidence included expert testimony from the ARB, the EPA and the state Legislature. We conclude that the trial court properly dismissed appellants' 20th cause of action.

### 6. Whether the ARB violated the mandates of the APA

On appeal, appellants claim that "without the required notice, review and determination, documentation, hearing or [Office of Administrative Law] review" the ARB "[adopted] SCAQMD's two flat bans as state law." ▮ Appellants' essential argument is that when the ARB includes a local rule in the SIP, it is required to conduct a separate rulemaking under the APA to readopt the local rule as a state regulation, even though the rule has already been adopted by a local district. Thus, by characterizing the ARB's actions as the adoption of a state law, appellants hope to make the ARB subject to the strictures and procedures of the APA.

The trial court held that the ARB's adoption of the Rule 1113 amendments did not constitute the adoption of regulations pursuant to section 39601 and therefore did not require compliance with the APA (Gov. Code, § 11340). It stated: "The ARB was not required to hold a public hearing prior to its adoption of the Rule 1113 amendments nor was its adoption of . . . the Rule 1113 amendments . . . procedurally defective under any of the theories/statutes alleged by Dunn-Edwards." The trial court held that the ARB's adoption of the Rule 1113 amendments and the inclusion of them in the SIP did not violate CEQA, stating: "The ARB is not required to conduct a second environmental assessment when the local agency District has already done so in compliance with CEQA and the ARB adoption involves no environmentally consequential changes." Citing section 41650, the trial court stated its belief that the power to promulgate regulations requires some compliance with the APA, while the power to coordinate the activities of local districts does not.

Under Government Code section 11346, the APA applies to the exercise of quasi-legislative power, and under Government Code section 11340.5, the

APA applies to the adoption of regulations. A regulation is broadly defined as " 'every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of the state agency.' (Gov. Code, § 11342, subd. (g).) A regulation subject to the APA thus has two principal identifying characteristics. [Citation.] First, the agency must intend its rule to apply generally, rather than in a specific case. The rule need not, however, apply universally; a rule applies generally so long as it declares how a certain class of cases will be decided. [Citation.] Second, the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' (Gov. Code, § 11342, subd. (g).)" (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 [59 Cal.Rptr.2d 186, 927 P.2d 296].) Therefore, the issue before us is whether the APA, which applies to regulations "adopted by any state agency" (former Gov. Code, § 11342, subd. (g), now § 11342.600), applies to the action of the ARB in approving amendments to local rules adopted by the SCAQMD and including them in the SIP.

Section 41650, relied upon by the trial court in making its determination that the ARB need not comply with the APA, provides that the ARB shall adopt the nonattainment area plans approved by the SCAQMD as part of the SIP unless the ARB finds, after a public hearing, that the nonattainment area plan will not meet the requirements of the CAA.[7] Accordingly, the ARB contends that where a local district has adopted and approved a plan, the ARB shall adopt the plan as part of the SIP, and need not proceed through the rigors of the APA.

In their brief on appeal, the ARB details the role of the ARB and the SCAQMD under the EPA. Each state must adopt and submit to the EPA an SIP for any air pollutant for which the EPA has promulgated standards. (42 U.S.C. § 7410(a).) The SCAQMD must develop and adopt a plan, which is adopted by the ARB and submitted to the EPA as part of the California SIP.

---

[7]Section 41650, subdivision (a) provides: "The state board shall adopt the nonattainment area plan approved by a designated air quality planning agency as part of the state implementation plan, unless the state board finds, after a public hearing, that the nonattainment area plan will not meet the requirements of the Clean Air Act (42 U.S.C. Sec. 7401 et seq.)." Subdivision (b) states that: "The primary responsibility for determining whether a control measure is reasonably available shall be vested in the public agency which has the primary responsibility for implementation of that control measure. The determination of reasonably available control measure by the public agency responsible for implementation shall be conclusive, unless the state board finds after public hearing that such determination will not meet the requirements of the Clean Air Act."

(§§ 39602, 40460, subd. (d).) The SCAQMD is also authorized to adopt and enforce rules and regulations to achieve and maintain federal NAAQS by reducing air pollutants. (§§ 40001, subd. (a), 40702.) These rules and regulations are binding upon adoption, and enforceable by the districts. (§§ 40001, 40702, 40752, subd. (b), 42400 et seq.) The ARB includes in the SIP and forwards to the EPA local rules and regulations and local AQMP's. (§§ 39602, 40460, subd. (d).) District plans and rules become enforceable under federal law after approval by the EPA. (42 U.S.C. §§ 7410(k), 7413.)

Accordingly, under state law, amended Rule 1113 became binding when adopted by the SCAQMD. The only effect of ARB's inclusion of the amended rule in the SIP is that it would be enforceable under the federal CAA if approved by the EPA. The ARB contends that while state law gives the SCAQMD the power to adopt binding rules for the control of air pollution from stationary sources (§§ 39002, 40001, 40702, 40752, subd. (b), 42400), the adoption of these local rules are in no sense state regulations. Thus, it urges, the Rule 1113 amendments are not regulations for the purposes of the APA, and the trial court was correct in dismissing appellants' action against the ARB.

The cases cited by appellants for their proposition that the ARB, as a state agency, adopted regulations and therefore should be governed by the APA, are distinguishable and do not avail them. In *Tidewater Marine Western, Inc. v. Bradshaw, supra,* 14 Cal.4th at page 571, the California Supreme Court held that the Division of Labor Standards Enforcement (DLSE), a state agency empowered to enforce California's labor laws, was subject to the APA, when it established a written enforcement policy to determine whether state labor laws applied to employees in the maritime industry. The court found that the policy was expressly intended as a rule of general application to guide deputy labor commissioners on the applicability of Industrial Welfare Commission (IWC) wage orders; it interpreted the law by determining the scope of the IWC wage orders; and it was not a mere restatement or summary of how the DLSE had applied the IWC wage orders in the past. (*Ibid.*) The policy, was, in effect, legislative in nature. (*Id.* at p. 573.) Here, on the other hand, the ARB did not act in a quasi-legislative manner by establishing a policy, guideline, or set of rules. Rather, it included in the SIP, an amendment to a rule established in the first instance by the SCAQMD. By the time the amendment reached the ARB, it was already an enforceable rule.

In *Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801 [114 Cal.Rptr. 577, 523 P.2d 617], the ARB was held subject to

the APA because the ARB thrice sought to postpone its oxides of nitrogen pollution control program for different reasons, the last being to conserve gasoline during the energy crises. The court concluded that the first two postponements were within the ARB's discretion because legislation conferred a limited discretionary authority to delay the installation program by postponing requirements for certificates of compliance and adjusting schedules. However, by determining that the energy crisis constitutes a compelling reason to postpone the program, in contravention of the purposes and goals of the Air Resources Act, the ARB had promulgated a regulation which conflicted with the purpose of governing legislation and improperly arrogated to itself the right to make legislative decisions, in violation of the APA. (*Id.* at p. 815.) Again, here the ARB has in no sense promulgated a new regulation; it has merely approved a local amendment and included it in the SIP.

Other cases cited by appellants are likewise distinguishable. In *State Water Resources Control Bd. v. Office of Admin. Law* (1993) 12 Cal.App.4th 697 [16 Cal.Rptr.2d 25], the Regional Water Quality Control Board adopted, and the State Water Resources Control Board approved, amendments to the water quality control plan for the San Francisco Basin. The court held that regulatory matters contained in water quality control plans are in fact regulations and that such regulations are neither expressly nor impliedly exempt from the provisions of the APA. (*Id.* at p. 706.) In that case, however, the adoption and approval of the amendments were quasi-legislative actions immediately binding on property owners, municipalities and port authorities. Here, the approval of the amendments by the ARB added nothing to their enforceability.

In *Western Oil & Gas Assn. v. Air Resources Board* (1984) 37 Cal.3d 502 [208 Cal.Rptr. 850, 691 P.2d 606], the California Supreme Court recognized that the ARB's proceedings in adopting standards of ambient air quality for each air basin are quasi-legislative in nature. The duty of the local and regional air quality districts are to promulgate and implement rules and regulations reasonably assuring achievement and maintenance of the state standards. (*Id.* at p. 509.) In that case, the ARB's compliance with the APA in adopting standards of ambient air quality, specifically for sulfates and for sulfur dioxide, was not an issue of contention as it is here. Similarly, in *Stauffer Chemical Co. v. Air Resources Board* (1982) 128 Cal.App.3d 789 [180 Cal.Rptr. 550], there was no dispute that the amendment by the ARB itself, of regulations enacted by the Bay Area Air Quality Management District governing sulphur dioxide emissions from industrial facilities, was a quasi-legislative action subject to APA.

The difference between this case and the cases cited by appellants is that the SCAQMD is the local board which has gone through extensive rule-making procedures in adopting the amendments to its Rule 1113. Under section 41650, the role of the ARB is to include the amendments in the SIP to be approved by the EPA. The discretionary action taken by the ARB in this case simply was not an adoption of a state regulation, and therefore, appellants' citation to section 39601, which authorizes the ARB to adopt regulations and requires the ARB to follow APA procedures, does not avail them. If, indeed, appellants would have us believe that any exercise of discretion by the ARB must be a quasi-legislative action subject to the APA, we reject that line of reasoning.

We conclude that the trial court correctly found that the ARB was not subject to the procedures and mandates of the APA in adopting the Rule 1113 amendments and including them in the SIP.

7. *Whether the ARB violated the mandates of CEQA*

■ Appellants contend that in approving the amendments to Rule 1113 and including them in the SIP, the ARB was required under CEQA to submit written documentation, including the functional equivalent of an EIR, to the secretary of the resources agency. We disagree.

Compliance with CEQA procedures is mandated for "projects," which are "[activities] directly undertaken by any public agency" that "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Pub. Resources Code, § 21065.) The definition of a project is not unlimited. A project "refers to the underlying activity which may be subject to approval by one or more governmental agencies; it does not refer to each of the several approvals sequentially issued by different agencies. 'The term "project" does not mean each separate governmental approval.' " (*Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 863 [237 Cal.Rptr. 723].)

In *Committee for a Progressive Gilroy v. State Water Resources Control Bd., supra,* 192 Cal.App.3d at page 863, a final EIR was prepared for the expansion of a wastewater treatment plant, a "project" under CEQA. The court held that the State Water Resources Control Board's "reestablishment of discharge requirements within previously approved levels is merely a separate governmental reapproval of the original project and does not itself constitute a new project under CEQA." (*Ibid.*) The court held that a subsequent EIR may be required in the situation where substantial changes are

proposed, circumstances require a major revision in the EIR, or new information comes to light. (*Ibid.*)

Here, as previously discussed, the SCAQMD complied with the mandates of CEQA when it adopted the Rule 1113 amendments. Appellants now attack the ARB for its failure to comply with CEQA in approving the amendments for inclusion in the SIP. Although, arguably, its acts were discretionary (a threshold requirement for CEQA compliance), the ARB did not propose substantial changes, nor was a major revision in the EIR required, nor had any new adverse information been produced which had been unavailable when the first EIR was completed. As previously discussed, the Rule 1113 amendments became binding and enforceable when adopted by the SCAQMD, and the ARB's approval and submission of the amendments to the EPA did not work a substantial change to the environment. The ARB did not exercise its discretion to repeal or revise Rule 1113, which, the ARB posits, would have been an action requiring CEQA compliance.

We are not persuaded by appellants' citation to *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263 [118 Cal.Rptr. 249, 529 P.2d 1017]. In that case, the Ventura County Local Agency Formation Commission (LAFCO) approved the annexation of 677 acres of agricultural land for urban development, which the court determined was subject to CEQA because the annexation would culminate in physical changes to the environment. The court characterized the LAFCO as a lead agency, which is the agency to act first on the project in question, and held it was subject to CEQA rules. Here, the issue of whether the ARB is a lead agency has not been raised.

Similarly, appellants' reliance on *Fullerton Joint Union High School Dist. v. State Bd. of Education, supra,* 32 Cal.3d 779, does not avail them. There, the court recognized that under CEQA, "any public agency directly undertaking a project which may have a significant effect on the environment must first conduct a threshold study of such impact. If the study shows that the project will not have a significant effect, the agency may so declare in a brief negative declaration; if it demonstrates that the project may have a significant effect, the agency must prepare an environmental impact report." (*Id.* at p. 794.) In that case, the State Board of Education approved a plan to create a new Yorba Linda Unified School District and directed that the proposal be submitted for approval in an election open to the residents of Yorba Linda. The court characterized the governmental approval as an essential step leading to ultimate environmental impact. (*Id.* at p. 797.) The

court concluded that environmental information must be furnished to the state board at the earliest possible stage since the state board and the voters are the decisionmakers. (*Id.* at pp. 797-798.) That situation is markedly different from the instant case since here the SCAQMD has already conducted a CEQA review and the ARB's approval does not further impact the environment. (See *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1315 [31 Cal.Rptr.2d 914] [a " 'significant effect on the environment' " means a change in the environment as it exists at the time of the agency's determination, not when CEQA was enacted].)

We hold that the trial court did not err in dismissing the action against the ARB.

DISPOSITION

The judgment is affirmed.

Cooper, J., and Todd, J., concurred.

On February 15, 2001, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied May 16, 2001.